# 23-702

===============================================================

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

Fernando G. IRAZU,

*Plaintiff-Appellant*

v.

Margarita OLIVA SAINZ DE AJA, Kevin Francis COLLINS,
Jeffrey Alan DIAMOND,

*Defendants-Appellees*

_____

On Appeal from the United States District Court
for the District of Connecticut

_____

**APPENDIX TO BRIEF OF APPELLANT FERNANDO G. IRAZU**

**VOLUME I**

_____

Fernando G. Irazu
Billinghurst 1656, 2 A
Buenos Aires, 1425
Argentina
+54 11 4824-1067
fgirazu@gmail.com

*Plaintiff-Appellant, Pro se, Attorney at Law*

===============================================================

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

**APPENDIX A**...............................................................................................A-3

Petition for Writ of Certiorari before the US Supreme Court of Justice dated 2/12/2013 (Exhibit D to Motion for Clarification and Objection of 6/2/2021 # 15).

**APPENDIX B**...............................................................................................A-71

Petition for Writ of Certiorari before the US Supreme Court of Justice dated 4/15/2019 (Exhibit G to Motion for Clarification and Objection of 6/2/2021 # 15).

**APPENDIX C**...............................................................................................A-156

Petition for Writ of Certiorari before the US Supreme Court of Justice dated 7/18/2019 (Exhibit H to Motion for Clarification and Objection of 6/2/2021 # 15).

**APPENDIX D**...............................................................................................A-373

Letter from Mr. Fernando G. Irazu to Judge Victor. A. Bolden and US Magistrate Robert Spector dated 6/2021 (Appendix I to Memoranda of 1/13/2023 # 28, # 29).

# **APPENDIX A**

Petition for Writ of Certiorari before the US Supreme Court of Justice dated 2/12/2013 (Exhibit D to Motion for Clarification and Objection of 6/2/2021 # 15).

No. _____

In The

# Supreme Court of the United States

———————— ◆ ————————

FERNANDO GABRIEL IRAZU,

*Petitioner,*

vs.

MARGARITA OLIVA SAINZ DE AJA,

*Respondent.*

———————— ◆ ————————

**On Petition For Writ Of Certiorari
To The Appellate Court Of The
State Of Connecticut**

———————— ◆ ————————

**PETITION FOR WRIT OF CERTIORARI**

———————— ◆ ————————

FERNANDO GABRIEL IRAZU, *Pro Se*
1340 Washington Boulevard,
Suite 504
Stamford, CT 06902
203-570-8318
fgirazu@gmail.com

A - 4

i

## QUESTIONS PRESENTED

**1**. Whether the lower State courts should have addressed and not ignored various requests from the petitioner to attest federal jurisdiction due to police brutality and discrimination against him in the State of Connecticut; someone who happens to be a naturalized United States citizen born and raised in Argentina, Latin America, of full Caucasian racial origin, though formally categorized and treated as Hispanic by the police and institutionally; all in the midst of fallacious criminal allegations and charges related to a seamless divorce process.

**2**. Whether such claims that demand the highest judicial scrutiny – including federal intervention via the duties held by the officiating magistrate and officers – triggered institutional and social biases, animosity, and persecution against the petitioner from the very same nest of the judiciary as well as the police and other organizations, needless to say his own social environment.

**3**. Whether the illegal and illegitimate criminal charges and arrests, as finally ordered to be erased by the criminal district court, were protracted in time against the petitioner's right to a speedy resolution in justice, while prompting and inducing him in this context to self-deportation to his country of origin for them to be discarded, thus at odds with such constitutional provision and in violation of his due process and equal protection under the law.

ii

## QUESTIONS PRESENTED – Continued

**4**.   Whether the lower State courts should have not allowed the petitioner to endure without counsel critical instances in a civil process and trial (no waiver from the petitioner) that revolved around those pending criminal charges in such contiguous and seamless criminal process, thus violating both his due process and equal protection under the law.

**5**.   Whether the lower State courts should have not allowed the petitioner to endure a Motion for Contempt of court process – finally triggering this instance with the same consent and suggestion of the district court – with the court-ordered appointment of an adverse counsel, which carried an incarceration penalty explicitly warned by the court *in situ*, thus violating both his due process and equal protection under the law.

**6**.   Whether in this case the lower State courts ignored both the applicable local and supreme law of the land in terms of technical defenses to the concept of a Motion for Contempt of court, in violation of both the petitioner's due process and equal protection under the law.

**7**.   Whether the Memorandum of Decision addressing the divorce of the parties, rendered in such a setting, is therefore void and null based on the process leading to it as well as the decisions of the lower State courts against its very same terms and the petitioner's inalienable natural rights: his right to

iii

**QUESTIONS PRESENTED** – Continued

be treated equally and with fairness under the law, to prosper and manage his own life and property in freedom per his own beliefs, and, above all, not to see his core parental rights curtailed because of any of the prior.

**8**.   Whether the lower State courts should have addressed and not ignored the petitioner's request for an injunction preventing different means in the open internet from tainting the petitioner's good name, honor, reputation as well as his professional career and prospects, all against the terms of a Motion to Erase from the criminal district court as to any claims, charges, arrests and/or remnants of this ignominy.

iv

## LIST OF PARTIES

Fernando Gabriel IRAZU, Petitioner
*Pro Se*
1340 Washington Boulevard, Suite 504
Stamford, CT 06902
203-570-8318
fgirazu@gmail.com

Margarita OLIVA SAINZ de AJA, Respondent
Attorney at Law
10 Indian Pass
Greenwich, CT 06830
203-861-9520
m.olivasainz@gmail.com

v

## TABLE OF CONTENTS

Page

PETITION FOR WRIT OF CERTIORARI .......... 1

STATE COURT OPINIONS................................. 1

JURISDICTION.................................................. 2

CONSTITUTIONAL AND STATUTORY PRO-
    VISIONS........................................................ 2

STATEMENT OF THE CASE............................. 4

REASONS FOR GRANTING THE PETITION ... 21

CONCLUSION.................................................... 39

## INDEX TO APPENDICES

APPENDIX A:  *Margarita Oliva Sainz de Aja
    v. Fernando Gabriel Irazu,* Appellate Court
    of the State of Connecticut (139 Conn. App.
    904 [AC 34364]), November 13, 2012..............App. 1

APPENDIX B:  *Margarita Oliva Sainz de Aja
    v. Fernando Gabriel Irazu,* FSTFA094017497S,
    Memorandum of Decision, September 2, 2010 ....App. 2

APPENDIX C:  *Margarita Oliva Sainz de Aja
    v. Fernando Gabriel Irazu,* No. PSC-12-0235,
    Order on Petition for Certification to Appeal,
    Supreme Court of Connecticut, December 18,
    2012 .............................................................App. 12

APPENDIX D:  *Margarita Oliva Sainz de Aja
    v. Fernando Gabriel Irazu,* FSTFA094017497S,
    Court Order, February 17, 2012 ...................App. 14

vi

TABLE OF CONTENTS – Continued

Page

APPENDIX E: *State of Connecticut v. Fernando Gabriel IRAZU,* Motion to Erase, CRO90165772S-CRO90168728S, Superior District Court of Stamford at Norwalk, January 30, 2012 ...........................................................App. 15

## TABLE OF AUTHORITIES

Page

CASES

*Boddie v. Connecticut,* 401 U.S. 371 (1971) ............... 27

*Bozzi v. Bozzi,* 177 Conn. 232, 413 A.2d 834 (1979) ....................................................................... 37

*Connecticut National Bank v. Voog,* 233 Conn. 352, 659 A.2d 172 (1995) ......................................... 37

*Connolly v. Connolly,* 191 Conn. 468 (1983) .............. 31

*Cuyler v. Sullivan,* 446 U.S. 335 (1980) ..................... 30

*Del Marcelle v. Brown County Corp.,* 680 F.3d 887 (7th Cir. May 17, 2012) .................................... 23

*Dupuis v. Submarine Base Credit Union, Inc.,* 170 Conn. 344, 365 A.2d 1093 (1976) .................... 37

*Eldridge v. Eldridge,* 244 Conn. 523, 710 A.2d 757 (1998) ............................................................. 31

*Gideon v. Wainwright,* 372 U.S. 335 (1963) ............... 30

*Glasser v. United States,* 315 U.S. 60 (1942) ............. 30

*Hall v. Hall,* 186 Conn. 118, 439 A.2d 447 (1982) ....................................................................... 37

*Kimberly-Clark Corporation v. Dubno,* 204 Conn. 137, 527 A.2d 679 (1987) ............................. 37

*Klopfer v. North Carolina,* 386 U.S. 213 (1967) ........ 27

*McMann v. Richardson,* 397 U.S. 759 (1970) ............ 30

*Ng Fung Ho v. White,* 259 U.S. 276 (1922) ............... 27

*O'Sullivan v. Bergenty,* 214 Conn. 641, 573 A.2d 729 (1990) ...................................................... 37

viii

TABLE OF AUTHORITIES – Continued

Page

*Perry v. Perry,* 222 Conn. 799, 611 A.2d 400 (1992)......................................................34

*Pet Care Products, Inc. v. Barnett*, 150 Conn. 42, 184 A.2d 797 (1962)..........................................37

*Powell v. Alabama,* 287 U.S. 45 (1932).....................30

*Prial v. Prial,* 67 Conn. App. 7, 787 A.2d 50 (2001)......................................................31

*Pritchard v. Pritchard,* 281 Conn. 262 (2007) ...........36

*Reid v. Covert*, 354 U.S. 1, 77 S. Ct. 1222 (1957) ......32

*Ricci v. DeStefano,* 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).................................................9

*Sablosky v. Sablosky,* 258 Conn. 713, 784 A.2d 890 (2001)....................................................32, 33

*State v. Curcio,* 191 Conn. 27 (1983)........................36

*Troxel v. Granville,* 530 U.S. 57 (2000).....................27

*Weinstein v. Weinstein,* 18 Conn. App. 622, 561 A.2d 443 (1989) ........................................36

*Worcester v. Georgia,* 31 U.S. 515 (6 Pet. 525) (1832)....................................................28

*Zoning Commission v. Lescynski,* 188 Conn. 724, 453 A.2d 1144 (1982)......................................37

1

**IN THE SUPREME COURT
OF THE UNITED STATES**

**PETITION FOR WRIT OF CERTIORARI**

The petitioner respectfully prays for a writ of certiorari issue to review the judgment from the State courts below.

———————◆———————

**STATE COURT OPINIONS**

A copy of the decision of the Supreme Court of the State of Connecticut denying the Petition for Certification from the ruling of the State Appellate Court is dated December 18, 2012, unpublished, and appears at Appendix C.

A copy of the relevant portion of the decision pertaining to a Motion for Contempt of Court from the Judicial District Court at Stamford, Connecticut, that triggered these further instances based on the consent and agreement of this district court, is dated February 17, 2012, and appears at Appendix D.

A copy of the decision of the State Appellate Court affirming the merits of the district court rulings was released November 13, 2012, published at 139 Conn. App. 904 [AC 34364], and appears at Appendix A.

A copy of the Memorandum of Decision ruling on the divorce of the parties is dated September 2, 2010, and appears at Appendix B.

2

A copy of the Order from the district criminal court granting a Motion to Erase is dated January 13, 2012, was granted on January 30, 2012, and appears at Appendix E.

———————◆———————

## JURISDICTION

The jurisdiction of this Court is invoked under 28 U.S.C. § 1257 (a) on a timely basis per final State courts' rulings above.

———————◆———————

## CONSTITUTIONAL AND STATUTORY PROVISIONS

"We hold these truths to be self-evident: That all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." Declaration of Independence, United States of America.

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." First Amendment, United States Constitution.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Fourth Amendment, United States Constitution.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence." Sixth Amendment, United States Constitution.

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Ninth Amendment, United States Constitution.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall

4

abridge the privileges or immunities of citi-
zens of the United States; nor shall any
State deprive any person of life, liberty,
or property, without due process of law; nor
deny to any person within its jurisdiction the
equal protection of the laws." Fourteenth
Amendment, United States Constitution.

"Rules to be interpreted literally. The
design of these rules being to facilitate busi-
ness and advance justice, they will be inter-
preted literally in any case where it shall be
manifest that a strict adherence to them will
work surprise or injustice." Rules of Appel-
late Procedure of the Connecticut Practice
Book, § 60-1.

─────────◆─────────

## STATEMENT OF THE CASE

**1.** This case is one of family relations within
divorce proceedings, coupled with contiguous criminal
actions fueling the latter as in a seamless process at
the local judiciary of the State of Connecticut. The *pro
se* petitioner claimed before all lower State courts for
federal jurisdiction to be attested with no response or
fortune.

The petitioner claims the police, government and
extended parties have displayed discriminatory biases
against him, and, in the case of the police and law
enforcement, brutality and various other illegalities.

5

One single magistrate from the district court has played defining roles in both the civil and criminal venues with contradictory results, and the other party's highly experienced counsel actively intervened in both courtrooms solely to advance civil claims.

In this context, the petitioner claims his right to counsel has been violated, as well as his rights to a swift resolution in justice and to be heard, all via an undue substantive and procedural overall process as well as an unequal treatment under the law.

As a naturalized American citizen, the petitioner also claims that he has been prompted or induced to "self-deportation" to his country of origin, Argentina, via the practical impact of these proceedings and its overall outcome.

Furthermore, due to the government's stance and related behaviors, the petitioner claims his parenting rights have been curtailed (including the only surviving grandparent's access to the couple's children in her place of residence); his health impacted; his good name, honor and reputation tainted; his finances and career decimated; and, *ipso facto*, the enjoyment and disposition of his real estate property taken away from him.

The criminal district court finally ruled all criminal claims and charges related to this ignominy to be erased, but such information remains in the open internet causing great distress to the petitioner, his children and relatives, needless to say further harm to his professional prospects.

As a result of all this, the petitioner claims his life, freedom, property and the pursuit of his own destiny per his beliefs have been unduly hurt in light of the supreme law of the land, including the core orders of the district court that ruled the divorce of the parties, and in particular due to the interpretation of such ruling via subsequent decisions of the lower State courts that contradict its plain terms, applicable local and federal precedents as well as statutory provisions.

Because of the above, the petitioner claims the core ruling from the district court that addressed the divorce of the parties can only be but null and void, and that all later decisions must follow the same path, especially the one related to a motion for contempt of court that triggered the window for this instance of review by the Court.

**2.** Based on the record and documentation before the State courts, among others, this combined civil and criminal process has followed this basic factual timeline for the 2007-2013 period:

**(i)** during 2007-8 the respondent hinted her desires to separate from the petitioner by requesting the joint marital real estate property to be placed under her sole name, among other evidence;

**(ii)** in December 2008-January 2009, the respondent secretly consulted a divorce attorney and proceeded with criminal charges against the petitioner, questioning his political views and beliefs, as reflected on the narrative of the official report from

7

the Victim's Advocate also circumscribed to the Young Women Christian Association (YWCA) of Greenwich, Connecticut; this organization was also consulted by the respondent;

(iii)  by mid-January 2009, the petitioner was arrested in the driveway of his own home in Greenwich, Connecticut, via an arrest warrant from the district criminal court of Stamford without probable cause, and subjected to illegal and brutal behavior during the course of his arrest before witnesses and at the Greenwich Police station;

(iv)  such arrest took place before the presence of the petitioner's 70 year old mother and younger brother, who had been brought for the occasion from a ranch in Las Pampas, Argentina, and the family's fulltime nanny;

(v)  the private schools of both the petitioner's two minor daughters and son, the Convent of the Sacred Heart and Brunswick School, respectively, were informed in advance of such event by the respondent; the respondent had transferred without consultation all of the family's cash savings, fruit of the petitioner's exclusive work from a joint bank account to an account of her own, appropriated some stocks certificate under the petitioner's name, as well as retained the couple's children's U.S. and Spanish passports, among other valuables;

(vi)  because of the other party's claims, the Department of Child Services of the State of Connecticut conducted an official investigation: interrogation

of 3 minor children and both parties, inspection of the house, interviews at schools, with physicians, etc.; such official investigation deemed this entire ignominy unsubstantiated and directed the petitioner to ensure adequate supervision, care and attention of his children and that they are not to be exposed to any violence, as well as advised individual and marital therapy for both parties;

**(vii)** the respondent immediately granted custody of the children to the petitioner, quickly reunited with him, and promptly repented before the court in person and in writing; the respondent retained her own criminal counsel, returned all cash funds to the joint account and valuables, and by April 2009 all charges were dismissed by Honorable Judge Malone from the Judicial District Court of Stamford at Norwalk;

**(viii)** the parties attempted to amend the situation, but the impact of it transpired via a cardiac unrest of the petitioner in May 2009;

**(ix)** on June 1, 2009, the petitioner communicated in writing to Honorable Judge Malone, the Greenwich Police Department (Lt. Richard Cochran, Head of the Domestic Abuse Unit), the State, Family Services and party counsel, the respondent's increasing desires to separate, what he had been subject to, the vocation at the time to undertake a private separation process, as well as the discriminatory behavior he had endured; this communication included sworn testimonies of witnesses to the arrest, relevant events

9

and information, as well as pictures of his bruised body due to police brutality and other topics related to this plot;

**(x)** during this very same timeframe (April-June 2009), the Supreme Court of the United States dealt with the issue of discrimination against Hispanics in the State of Connecticut *in re Ricci v. DeStefano*, 129 S. Ct. 2658, 2671, 174 L. Ed. 2d 490 (2009);

**(xi)** the petitioner was seriously affected and could not regain employment during summer-time of 2009; he discovered in his own home handwritten evidence by the respondent revealing divorce counsel advice prior to such arrest, defamatory statements, advice for female-biased psychological counsel as part of a divorce strategy, as well as potential monetary and parenting outcomes in a divorce process (submitted as evidence during the divorce trial); the differences became more and more irreconcilable and by early September 2009 the parties agreed to separate on friendly terms (written evidence provided: more favorable terms for the respondent than the final ones due to the financial impact and devastation on this party and as a whole);

**(xii)** in early October 2009, the respondent, represented by the same divorce attorney she had consulted in late 2008-early 2009 (an expert family law and domestic abuse lawyer with decades of experience before the local courts), filed for legal separation against those friendly terms and refused to abide by them throughout the entire process;

**(xiii)** in early October 2009, Honorable Judge Malone granted an ex-parte civil restraining order for the petitioner not to enter again his own home (bought with the fruit of his own effort) because of financial inquiries and no other reason;

**(xiv)** after agreeing to it, in October 2009, the petitioner was denied of the opportunity to travel to Argentina with his 3 children to visit their grand-mother and closest family relatives (they had been very attached to them until then); the petitioner had traveled alone with them to different locations, including Argentina (Buenos Aires and Las Pampas); the couple's children would not be able to visit their only living grandparent and blood relatives in their own place of residence up to the present date; the petitioner did authorize the respondent to travel to Spain at various times, and she would later do it without consultation or authorization from the petitioner in plain violation of court orders when not international law;

**(xv)** in November 2009, the petitioner was charged with threatening and disorderly conduct, after having reached out to the Greenwich Police Department on some occasions in anticipation of this frame; the police one more time violated the law in multiple fronts, with another illegal and illegitimate arrest, aggressive biases, harassment, intimidation, monitoring and surveillance, as well as entrapment against the petitioner (discriminatory sponsored behavior from the government against one specific individual in his own social environment, who is

"singled-out" precisely in a potential case for undue discrimination, police brutality and ideological issues), which also included invasion of privacy (directly or not), civil inspectors, as well as fake clients or charged individuals in a staged parody within the courthouse trying to induce the petitioner to declare himself guilty of a crime under the Alford doctrine or not; once more, Honorable Judge Malone was the officiating judge for almost a year without any resolution on the matter; even the other party's counsel with police assistance tried to have the petitioner arrested another time without success; criminal threats became a *modus operandi* to advance civil claims from the other side, in tandem with counsel and police aid, among others; the petitioner again communicated to the Greenwich Police Department the ongoing biases against him, and his own civil counsel disassociated from the case before Honorable Judge Malone after having taken damaging measures against the petitioner's position;

**(xvi)** the other party had accused the petitioner before the district criminal court of being mentally insane, and the petitioner offered several psychiatric and psychological studies and evidence, in a one-year evaluation period, that corroborated his full mental sanity, standard personality, and non-violent nature and disposition (the petitioner never was nor is a peril for anybody in his family and/or community);

**(xvii)** the other party had put herself in technical contempt to court on various opportunities, sequestering this time via legal counsel and against

court orders all of the cash funds, as well as preventing the petitioner from having counsel;

(**xviii**)   per the other party's decision, a divorce trial was conducted with the petitioner now having to act *pro se* and with a pending criminal process within this overall picture (no waiver granted; he expressed his concerns on the record);

(**xix**)   in April 2010, Greenwich Police Lt. Richard Cochran was the recipient of the Greenwich Lions Club 2010 John Clarke Award for his work with domestic violence victims in Greenwich, Connecticut, and pictured in the local press holding a yellow handgun teaser; such press report included an article with praises from the victim's advocate who assisted the respondent as well as the State prosecutor; this police officer was within the top 10 highest paid government officials in Greenwich that year: $169,365 ($56,906 in overtime);

(**xx**)   after a trial without formal jury, a Memorandum of Decision was dictated via late Honorable Judge Dennis Harrigan on September 2, 2010, which granted the petitioner the right and prerogative to offset any debts he might have toward the respondent, pursuant to any orders of the court, against his 50% equity interest in the family home, now the exclusive residence of the respondent and the couple's children subject to certain conditions; the petitioner is obliged to pay an equal share of real estate taxes on this asset;

(**xxi**) different court orders of the Memorandum of Decision literally reflect the proposed orders from the respondent's counsel; the petitioner had requested joint physical and legal custody of the couple's minor children, as well as proposed a detailed parenting plan considering their *pari passu* status, his potential foreign residence and the necessary access of grandparents to the couple's children, all under the principles of their Christian faith; the court granted joint custody to both parents, established "primary residence" of the children with the respondent, and considered more appropriate the weekly schedule and vacation plan submitted by the other party's counsel;

(**xxii**) the petitioner promptly clarified before the district court his understanding of such judgment vis à vis his constitutional rights and requested a written clarification from the court without success;

(**xxiii**) the petitioner quickly complied in excess with all financial orders, despite his discretionary right and prerogative on the subject per the literal terms of the Memorandum of Decision;

(**xxiv**) in late 2010, the criminal process was discarded upon the specific premise the petitioner was to leave the United States for Argentina, assuming the standard one year probation period, yet Honorable Judge Malone had now excused himself from this criminal process; at this point in time, the other party's counsel threatened the petitioner in writing with extending the criminal process;

**(xxv)** in November 2010, the other party's counsel proceeded to sequester a large amount of money from the petitioner's personal bank account in the United States, arguing an inexistent debt and without his knowledge or presence before Honorable Judge Malone, who was again dictating the civil process by himself; this decision was never communicated to the petitioner (now residing in Argentina) by anybody (including the financial institution), properly or not;

**(xxvi)** once the petitioner was in Argentina, the respondent asked him to execute an application form to refinance the existing mortgage on the family home at better terms, since she is obliged to assume the interest payments on that loan as well as expenses related to the house per court orders; the respondent also took a home equity loan, and the petitioner does not know what finally occurred with this mortgage refinancing application and whether such existing debt-ceiling has not been surpassed in detriment of his patrimony;

**(xxvii)** pursuant to the financial orders of the Memorandum of Decision, after trying in good faith via various correspondence since early 2011, some HSBC shares could not be transferred to the respondent for multiple reasons from the United Kingdom via Argentina to the United States;

**(xxviii)** while in the United States in March 2011, the petitioner discovered the hidden sequestration of funds from late 2010 via Honorable Judge

Malone, and in good faith did not deliver the amount equivalent to the value of those HSBC shares (still having a net credit in his favor) per his own right within the orders of the Memorandum of Decision;

**(xxix)** residing in Argentina because of the sequels of this process, the petitioner would be further cut off from the couple's minor children's lives in violation of court orders: lack of basic coparenting and no conferencing; out-of-State travel of minor children by themselves without the petitioner's due consent; international travel with their mother without proper authorization, and no information as to their destination, address, telephone numbers, etc.; withholding of critical health information (Lyme disease, cornea injury, etc.); camps and educational activities, etc.; please note the same court orders of the Memorandum of Decision impose clear duties and grant "primary residence" of the children to the respondent upon her own representation (Provisions 1, 5, 6 and 7);

**(xxx)** while the petitioner was in Argentina during the period April-July 2011, without being able to defend himself (he was not allowed to argue via videoconference, etc.), the other party's counsel pursued a motion for contempt of court and a *capias* was issued against him; from Argentina the petitioner posed to the court the need to attest federal jurisdiction in light of the ongoing situation, once more interrupting any statutes of limitations before the judiciary due to the events dating back to early 2009, and filed a motion for contempt of court against the

respondent for lack of coparenting per court orders, among others; the petitioner also informed the court he would be in the United States for his son's birthday on July 31, 2010, and respectfully indicated his preference for not being arrested at the time of entering into the State of Connecticut because of such *capias*;

(**xxxi**)  in late July-early August 2011 the petitioner is brought to court by the other party and, counting on the court-mandated assistance of an adverse counsel (the one who had disassociated from the case more than a year before – without having participated in the divorce trial nor having any understanding of the issue at hand, was now in fact suing him for legal fees without his knowledge at the same time he was appointed to defend him – ), he was found in contempt to court by Honorable Judge Wenzel for his decision adopted per (xxviii) above; on this occasion, Honorable Judge Wenzel deemed such contempt purged after the respondent incurred in further financial debt before the court to comply with the delivery of the sum equivalent to the value of those HSBC shares, and advised the parties to deal in private with all outstanding issues;

(**xxxii**)  the petitioner was in fact denied of the opportunity to be heard on his own claims to the court, and once again he was prompted to relocate to Argentina; the other party refused to follow Honorable Judge Wenzel's recommendation in writing; the respondent did not need any of those funds, neither was nor is in financial distress, not even to afford

17

summer vacations in Nantucket, Rhode Island (2010), Menorca, Spain (2011), to deliver those funds as legal fees to party counsel, or to pay for individual weekend travelling, domestic or international, among others;

(xxxiii) during the fourth quarter of 2011, professor John Mansfield from Harvard Law School offered the petitioner to sponsor him to pursue his doctoral degree in juridical sciences at Harvard University, after the petitioner having approached him regarding his potential academic career path, in tandem with some of his past professional experience as well as attendance to a Harvard Law School Alumni Seminar on the subject a few years earlier; considering the Fall-2012 start for the doctoral program, professor Mansfield suggested the petitioner to be at Harvard Law School in early 2012 as a Visiting Scholar-Researcher; from Argentina, the petitioner requested from the respondent the funds stolen from him for that to be the case, but the other party refused to comply with such request; this long-sought after professional opportunity was lost;

(xxxiv) in late 2011, the one year standard probation in the criminal process lapsed and the petitioner returned to the United States; in February 2012, he was brought again to court by the respondent on the issue of contempt to court, which motivated this very same appeal following the suggestion and consent of the trial court; again, the petitioner

18

requested to attest federal jurisdiction before the judiciary at different instances of review;[1]

**(xxxv)** in December 2011, the respondent's Spanish mother passed away in the United States; thus her patrimonial situation changed significantly for the better, so as for her to be able to acquire the petitioner's equity interest in their still jointly owned house at market value (now approximately $2,200,000);

**(xxxvi)** in January 2012, a Motion to Erase on the criminal side was granted by Honorable Judge Comeford, attesting the "for-the-occasion" filing of all these criminal claims and charges as well as the devastating impact of this tragedy;

**(xxxvii)** in the meantime, Google, local bloggers and newspapers still reflect in the open internet the charges ordered to be erased by the district criminal court, thus tainting in our contemporary times any standard electronic job search or otherwise

---

[1] Motions dated June 17, 2011, July 11, 2011, September 28, 2011 (Motion to Consolidate and Transfer with Exhibits incorporating written evidence and pictures, all included in the record by the Appellate Court) before the Superior District Court of Stamford at Norwalk, among other prior specific filings and testimonies during the divorce trial and criminal proceedings, as well as correspondence to the officiating magistrate, court officials and the Greenwich Police Department; Brief dated April 9, 2012, and Reply Brief dated May 15, 2012, before the Appellate Court; Petition for Certification dated November 20, 2012, before the Supreme Court of the State of Connecticut.

by the petitioner; those parties were timely requested not to display what was legally erased;

(**xxxviii**)  in May 2012, the petitioner returned to Argentina to pursue a business venture which would have enabled him to overcome the financial ruin resulting from this process as well as to be reunited with his children as in the past; yet, the current local political environment is notorious for its adversity toward foreign investment, so last September 2012 the petitioner decided to return to the United States for good and with the expectation of an equitable decision from the Appellate Court for that to be the case;

(**xxxix**)  while awaiting the ruling from the Appellate Court, the petitioner was once more subject to monitoring, verbal abuse and criminal threats of various sorts, a situation he quickly communicated to the court; those criminal threats stopped when the respondent received a favorable ruling from such tribunal;

(**xl**)  on November 13, 2012, the Appellate Court affirmed the judgment from the district court (both the Memorandum of Decision and the Motion for Contempt of Court) *per curiam*; and on December 18, 2012, the Supreme Court of the State of Connecticut simply denied the Petition for Certification from the petitioner;

(**xli**)  due to all of the above, it has been virtually impossible for the petitioner to find employment in the United States based on his experience and latest

income generation capacity ($1,050,000 for the pro-rata 2007-2008 compensation period at his prior employer HSBC[2]);

**(xlii)** currently, the petitioner is homeless and living out of charity from friends and family while incurring in further financial debt to cover daily expenses; if the emotional loss deriving from this devastating process is unquantifiable, the financial one is in the millions and millions of dollars; the respondent is a partner with Chadbourne & Parke in New York City, who only returned to full-time employment at her prior employer after the divorce of the parties was completed, and currently enjoys a yearly salary that covers in excess of any historical family budget;

**(xliii)** on a *pro se* basis, the petitioner has timely filed this writ for certiorari petition.

It has been said for centuries that the Supreme Court is a forum devoted to address issues and not to revise factual errors, but the issue regarding the perversion of justice is what makes people claim for it, all in all because: "*I love judges, and I love courts.*

---

[2] Gross base salary of $200,000, and incentive compensation of $850,000 for 2007: $620,000 as cash award, and $230,000 as restricted shares.

*They are my ideals, that typify on earth what we shall meet hereafter in heaven under a just God.*"[3]

————————◆————————

## REASONS FOR GRANTING THE PETITION

**1.** The questions presented above by the petitioner could be summed up in the following way:

Is the government entitled to discriminate by itself or via certain society or groups against "one single individual" who is a citizen of the United States of America; to obviate ruling on his discrimination claims in State courts that require local magistrates to attest federal jurisdiction and involve federal officers; to protract in time a judicial process tainting his good name, honor and reputation as well as devastating his financial assets, potential professional chances and income generation capacity per historical standards; to deprive him of the enjoyment and disposition of his private property; to determine his estate planning against his will (still in place) and to order the imposition of welfare benefits (out-of-state, at the time of the judicial decision); to arrest him without probable cause within this overall context, including acts of police brutality and undue search and seizure, as well as to harass him, to

_____

[3] Mason, William Howard Taft, in III *The Justices of the Supreme Court* 1789-1978 2105 (L. Friedman and F. Israel ed. 1980), quoted in Scalia, Antonin, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849 (1989).

monitor his activities, and to promote entrapment and invasion of privacy; to continue this path after him having raised these issues before a magistrate, court officials, counsel and the police; to persecute him for inexistent debts and ideological reasons; and to deny him of his right to counsel and/or to appoint an adverse, unethical and/or incompetent one within this setting, all via a single though dual civil and criminal process related to parental and marital dynamics?

Therefore, the constitutional and inalienable rights of natural origin of the petitioner, in particular his right to be treated equally and with fairness under the law, to private property (not to be unduly deprived of, as well as to enjoy and be able to dispose the fruit of his own effort of decades) and to be able to prosper in life independently, thus the possibility to exercise his fundamental parental rights *pari passu* with the respondent, have also been unduly violated in the process that birthed the Memorandum of Decision under scrutiny as well as the subsequent decisions of the lower State courts interpreting it?

**2.** As to the petitioner, a male individual, please note that he is of Hispanic origin because he has been categorized as such during this overall process by both the Greenwich Police Department and the lower district court. Hispanic is a racial imposition of geographic nature to those born in Latin America, irrespective of race, as most government forms disclose: "*White, non-Hispanic*" or "*Hispanic*." A Latin American, albeit a naturalized United States citizen

as in this case, is precluded from honestly saying to the U.S. Government that he is Caucasian in such a dichotomy. Although the petitioner is Caucasian by his entire Western European ancestry, the Hispanic categorization and biased treatment in false domestic abuse claims leading to his illegal arrests and divorce process was presumably imposed on him due to his place of origin, never requested nor claimed by him, and it was particularly referenced by the district court in the preface of the Memorandum of Decision judging on the parties' divorce. The petitioner's name is "Fernando Irazu," he was born and raised in Argentina, Latin America, holds deeply rooted conservative beliefs, and does speak English with an accent revealing his non-native origin.

**3.**    As to the overall frame of the questions posed to the court, the petitioner argues that the precedent most up-to-date with the discriminatory situation he has been subject to refers to, in a reverse or inverse fashion, the so-called "one-in-a-class" discrimination case addressed *in re*, *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. May 17, 2012). This case dealt with a white family who was subject to harassment by a gang of motorcyclists, and requested assistance from the local police. Such help was not granted as expected, and the family was in principle induced or compelled to relocate. Those affected sued the local police. Although the majority ruled that the police was not obliged to provide "private security" – therefore, the court discarded their claim – , they did

concede the discriminatory element demanding proper scrutiny was present.

In a multilayer racial society like the American one, where the Hispanic component (understood as the Latin American population influx at large) is more and more relevant and becomes less and less evident from a singular racial standpoint as time goes by, it is the belief of this party that the proper way to address discrimination goes to the element of being "singled-out" in an undue fashion in light of and not due to categories related to skin color, appearance, male or female sex, place of origin, religious, political or anthropological beliefs, etc. Such discriminatory practice could take multiple forms: from isolation or exclusion to plain harassment, persecution or violence. Any human traits can become a defenseless prey under this scenario. There is no suspect category in justice but the category of being wrongly discriminated on a case by case basis per common law. The most alarming part resides in the government being part of it, directly or indirectly.

Even "private police security" to someone arguing domestic abuse claims in the context of a divorce process (preparatory or ongoing) can never amount to illegal government or related behavior and the destruction of another person's life. In particular, if such person is highlighting that sort of wrongdoing on the government's part, as well as requesting for it not to continue because he does fear it will continue. And precisely so, it did continue in the present case.

**4.**  Please note that in the case under analysis we are talking about an individual who was "singled-out" not by a gang of motorcyclists but the very same government and his community in the midst of divorce proceedings via a side criminal action to advance civil claims, also with an ideological stance in the so-called identity politics (male and female dynamics under domestic abuse laws, processes as well as marital roles and views). Moreover, this whole process impacted his health, tainted his good name, honor and reputation, exhausted his financial resources, precluded him from finding employment, deprived him of the disposition and enjoyment of his real estate property, and compelled him to relocate to his country of origin. All in all, considering that the State agreed to discard such outstanding criminal claims and charges only if the petitioner were to leave his own adoptive country for Argentina, abiding by another year of standard probation, and after more than a year of almost monthly visits to the courthouse (long hours) with various attempts for the petitioner to voluntarily declare himself guilty of a crime.

**5.**  As recounted, please note that at critical instances from the institutional side both the civil and criminal processes were ruled by the same magistrate. The petitioner himself filed sworn testimonies from various parties within the criminal process, even sworn testimonies from the same respondent corroborating the fallacy and illegality of this process. In other words, both processes did not commingle

from this side of the aisle if it were not for the peti-
tioner to defend himself and inform the court on a *pro
se* basis of this overall situation; but by default they
were fully intertwined via the ruling magistrate as
well as the permanent angle put forward by the
respondent's highly experienced counsel in both
courtrooms (before the same magistrate) solely to
advance her civil claims. However, counting on the
presence and consent of the State, the district crimi-
nal court literally recouped the traits of this ignominy
by granting a Motion to Erase as to any and all
claims and charges scourged on the petitioner.

**6.** Per court records, without success the peti-
tioner timely requested the lower State courts to
attest federal jurisdiction due to the underlying
subject matter, which demands the highest judicial
scrutiny. The petitioner requests this sort of scrutiny
before this Court in light of his inalienable natural
rights protected by the Declaration of Independence
of the United States and its derived Constitution, his
United States citizenship, and the specific discrimi-
natory elements present in his own case, irrespective
of his race, place of origin, male sex and standard
personality, appearance as well as political and
religious beliefs; and regardless of the fact that the
government's views and actions in this process (ex-
panding into other spheres) have been motivated by
any or all of them in an undue fashion. More precise-
ly, it has been duly noted that strict scrutiny must be
observed when court decisions end up infringing

fundamental parental rights (*in re*, *Troxel v. Granville*, 530 U.S. 57 (2000)).

**7.** In addition, denying an American citizen of his rights and justice by delaying in time a criminal process via the so-called *nolli prosequi* has been deemed a constitutional violation (*in re*, *Klopfer v. North Carolina*, 386 U.S. 213 (1967)). Even more so when such government behavior has the impact of placing limitations on one's liberty; tainting one's good name, honor and reputation; impacting one's professional career; generating great anxiety and concern on such victim; as well as curtailing his freedom of speech and, in this specific case, the exercising of his core parental rights. Furthermore, it has also been stated by the Court that "*Due process requires, at a minimum, that. . . . Persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard.*" (*in re*, *Boddie v. Connecticut*, 401 U.S. 371 (1971)).

This party is of the belief that such standard certainly applies to situations entailing prosecution and incarceration based on an open criminal process and/or the concrete result of specific judicial measures at the civil level (*capias* or a motion for contempt). And in connection with the implied "self-deportation" of the petitioner either on the criminal or civil side, the Court has also stated that an American citizen must be given the opportunity to plead his case in court upon threats of deportation (*in re*, *Ng Fung Ho v. White*, 259 U.S. 276 (1922)). Indeed,

history shows that a posthumous pardon is not enough for someone facing criminal charges and deportation from his place of residence for exercising his right to freedom of speech and of religion, within his family, community or at large, either he is liked or disliked by government officials, his neighbors or whoever minds to be concerned about his views and businesses (*in re*, *Worcester v. Georgia*, 31 U.S. 515 (6 Pet. 525) (1832)).

**8.**  In connection with the Motion for Contempt of Court leading up to this instance, the current interpretation of the Memorandum of Decision has the practical consequence of holding that an outstanding father – per both the opinion of the court and the respondent – can be abused and discriminated against, be extirpated of his entire assets, see his personal and professional life ruined, and thus be precluded from exercising his parental rights per government and related actions. Due to the impact of this tragedy the petitioner is unemployed, and his 50% equity interest in the jointly owned family home with a market value in the range of $2,200,000 (paid with the fruit of his work) is all that's left in his hard-earned patrimony of decades that generated millions of dollars.

**9.**  In contradiction with the terms of the Memorandum of Decision, applicable local law as well as federal precedents from this Court, the lower courts have ignored the standard proven technical defenses to the concept of contempt to court in the case under analysis, namely:

**a.** *Matter of Strict Legal Interpretation: Clear Individual Right and Plain Meaning*. The Memorandum of Decision succinctly states: "*Any sums due to the wife pursuant to any orders of the Court shall be paid to the wife at the closing from the husband's portion of the net closing proceeds [from selling the family home at the then applicable market price].*" (Provision 3a.). It is then clear the petitioner has the right and prerogative to offset any debts with the respondent against his equity participation in his home per any court orders. Furthermore, the same rules of the Appellate Procedure of the Connecticut Practice Book address the subject of legal interpretation in plain terms: § 60-1 does prescribe "*Rules to be interpreted literally. The design of these rules being to facilitate business and advance justice, they will be interpreted literally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice.*"

**b.** *Right to Counsel: Adverse and Lack of It*. As evidence on the record accepted by the lower court reflects, the petitioner was precluded from retaining counsel at critical instances during the divorce process and trial that revolved around criminal charges (some of them outstanding at the time); and he also exercised his own defense by producing various filings on the criminal side leading to his exoneration and incineration of any criminal records. Moreover, the petitioner received the *in situ* court-mandated assistance of a civil counsel who was suing him at the very same time he was called to defend him (a situation

unknown to him until he was declared in contempt of court). This counsel disassociated from the divorce process right after the petitioner having raised again the issue of discrimination before the police, and after having taken damaging measures against the petitioner's position. Furthermore, he had no prior knowledge or current understanding of the facts and issues surrounding the motion for contempt of court pursued by the other party.

In connection with this topic, the Court has stated that "*[T]he right to counsel is the right to the effective assistance of counsel*" (*in re*, *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970)), as well as that such appointment must afford "*effective aid in the preparation and trial of the case.*" (*in re*, *Powell v. Alabama*, 287 U.S. 45, 71-72 (1932); *Glasser v. United States*, 315 U.S. 60, 70 (1942)). This Court has further held that "*The right to counsel prevents the States from conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance*" (*in re*, *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)), after affirming that "*The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours.*" (*in re*, *Gideon v. Wainwright*, 372 U.S. 335 (1963)).

**c.** *Good Faith; No Willful Disobedience to Any Court Order*. Taking into account the other party had sequestered before the judiciary an even larger amount of money via a spurious and concealed maneuver, the petitioner acted in good faith and

pursuant to his right and prerogative within the Memorandum of Decision as an overall net creditor by finally not delivering certain HSBC shares. Unemployed and without income, the petitioner had been literally robbed. Moreover, before discovering the illegitimate sequestration of funds the petitioner had taken all necessary steps to transfer those shares, which was not possible from a technical standpoint from Argentina. Per its terms, the Memorandum of Decision clarifies that unemployment does not carry debts or financial obligations, needless to say for any of them to be paid from limited savings destined to survive as well as to hopefully re-enter the workforce and prosper in life.

As to the standard of appellate review of a Motion for Contempt, it has been indicated at the lower level that a conduct must be willful against a court order, which by default cannot be the case in the situation under analysis when one party exercises in good faith a right per court orders, applicable per those plain terms toward any other court order, as well as when a simple good faith dispute or misunderstanding on the subject in itself precludes such willful component from being verified *ab initio* (*in re*, *Connolly v. Connolly*, 191 Conn. 468, 482 (1983); *Prial v. Prial*, 67 Conn. App. 7, 14, 787 A.2d 50 (2001); *Eldridge v. Eldridge*, 244 Conn. 523, 529, 710 A.2d 757 (1998)).

**d.** *Harmonic Interpretation to Prevent Non-Stop Destructive Litigation, Counterclaimant's Clarifications and Individual Constitutional Rights.* The

Court has emphasized in multiple situations, including some territorial cases, that the court is to "*provide an illustrative method for harmonizing constitutional provisions which appear, separately considered, to be conflicting.*" (*in re*, *Reid v. Covert*, 354 U.S. 1, 77 S. Ct. 1222 (1957)). Based on the record, the respondent has in fact displayed a destructive litigant appetite if we objectively look at the final outcome of this process and what had already been agreed by the parties without any legal contentiousness. It is evident to this party that the right and prerogative vested on the petitioner per Provision 3a of the Memorandum of Decision serve the purpose of keeping such unnecessary attitude outside any courtroom; while providing the petitioner with financial oxygen to prosper in life, hopefully in similar terms to those of his very successful professional past when not the financial health currently enjoyed by the respondent. Unfortunately, the lower courts did not interpret it that way from the onset, and in literal terms any gas in his truck's tank was taken away from him.

The lower court has deemed that the clarity of the terms on the issues under analysis is considered essential in the legal mechanism, either patrimonial, financial or with regards to parenting matters, so as for the judgment to unfold in a coherent and fair basis (*in re*, *Sablosky v. Sablosky*, 258 Conn. 713, 720, 784 A.2d 890 (2001)). Based on the *status quo*, it is the view of this party that disregarding the clear and plain meaning of Provision 3a of the Memorandum of Decision implies the expropriation of the petitioner's

entire patrimony per court's decree and with the undesired effect of further curtailing his parental rights. All of it, against the basic and coherent rationale of the judgment contained in such Memorandum of Decision. Furthermore, it must be highlighted that the petitioner promptly clarified before the lower court his understanding of such judgment vis à vis his constitutional rights, and none of it was rebuked by the other party if it were not for the concealed sequestration of his own funds as well as the *capias* and motion of contempt to court against his right and prerogative per Provision 3a of the Memorandum of Decision.

**e.** *No "Self-Help," Rather Proper Exercising of Individual Right*. In all fairness, the exercising of an individual right per its plain legal interpretation as well as the factual attitude of the petitioner through time cannot be categorized as "self-help" irrespective of its righteousness within a coherent and harmonizing frame (*in re*, *Sablosky v. Sablosky*, 258 Conn. 713, 720, 784 A.2d 890 (2001)).

**f.** *Proper Proof of Inability to Pay*. As proven on the record, on August 2, 2011, the petitioner had to incur in financial debt to deliver a $20,000 bank check before the district court by resorting to friends in the area; all under penalty of his immediate arrest by State Marshalls within the courtroom and a 30 day incarceration period in a nearby facility. The other party nonetheless demanded such payment. In this regard, the inability to pay not only acted *in situ* as a defense to the charge of contempt to court, but

its burden of proof was in fact revealed with full certainty before the very same court (*in re*, *Perry v. Perry*, 222 Conn. 799, 805, 611 A.2d 400 (1992)).

**g.** *Track Record of Full Compliance with Court Orders and Current Unemployment*. As proven on the record, the petitioner did comply with all financial orders of the Memorandum of Decision or otherwise in excess. He granted the respondent funds in excess via such compliance (more equity stock) as well as other means (full tax return for the prior fiscal year, etc.). Apart from the fact the petitioner was unemployed, there was no debt on the petitioner's shoulders when the respondent's counsel proceeded to sequester ex-parte the petitioner's cash funds in a surreptitious fashion in late 2010; therefore, he was not obliged to serve any eventual debt either per the clear terms of the Memorandum of Decision on the subject or his own right and prerogative per its Provision 3a.

**h.** *Impossibility, Bad Faith, Entrapment, Financial Misdeeds and Strength, as well as Fault from the Other Party*. Evidence on the record corroborates the petitioner promptly took all necessary steps to transfer some HSBC shares from Argentina without success, which vested in February 2011 and were held electronically in the United Kingdom, to the respondent in the United States. Moreover, the respondent did fail to take any of the eventual steps required from her side for that to happen via the United Kingdom (clearing agent). Both such impossibility and the respondent's distraction still reveal the good

faith of the petitioner. Regardless of knowing the illegitimate sequestration of funds from late 2010, the other party still pursued a Motion for Contempt of Court requiring the delivery of those shares without any further due, including a *capias* for inexistent mathematical debts.

It must be highlighted that in late 2010, while residing in Argentina and without knowing of such sequestration of funds, the petitioner was asked by the respondent to execute an application form for a mortgage refinancing to improve borrowing terms, which he did execute under the premise the existing debt-ceiling was not going to be unilaterally sur-passed (a mortgage loan of $139,000), since the re-spondent is the sole payer of all interest expenses of such loan as well as costs and repairs of the house as her exclusive residence, all per the terms of the Memorandum of Decision. Based on the latest finan-cial affidavit of the respondent, she did obtain an additional home equity loan but it is unknown to the petitioner the status of such mortgage refinancing. The petitioner is still legally attached to such mort-gage loan with its necessary credit and legal impact, and the respondent appears to be unconstrained as to her borrowing capacity vis à vis 100% of the equity in the house. In addition, the respondent is obliged to pay an equal share of real estate taxes.

Apart from having been deprived of his entire patrimony in theory and practice, the petitioner could be further exposed to financial indebtedness when not fraud from the other party. Please note that per court

orders the respondent is basically in charge of the petitioner's estate planning, i.e., $1,000,000 insurance policy on his life, currently paid by her and in her possession. Indeed, the recurrent misdeeds of the other party during this process have been clearly disregarded in prior instances, and they seem to have also operated as a clear entrapment or estoppel from the legal forum. It is the belief of this party that the petitioner's right to be timely heard should have not been abridged due to any formal compliance in time, so as for him to remain in close proximity to the couple's children and to progress in life free of any legal harassment and financial persecution, rather accepted in furtherance of the applicable substantive rules per equitable principles (*in re*, *State v. Curcio*, 191 Conn. 27, 31 (1983); *Pritchard v. Pritchard*, 281 Conn. 262 (2007)).

The respondent's financial strength, not only due to the petitioner's actions but also her own patrimony – either on her head or via the couple's children – and income generation capacity, cannot justify any of this behavior with judicial shelter. Indeed, the purpose of alimony is only applicable in situations where the spouse honorably requires and is in need of such an award, provided it can be granted, and it is not an absolute entitlement either prior or post-judgment, so as to secure in this fashion an equitable relationship, in particular when it could affect or actually impacts the access of one of the parents to the couple's children (*in re*, *Weinstein v. Weinstein*, 18 Conn. App. 622, 637, 561 A.2d 443 (1989), among others).

Within this pattern, the petitioner has not been able to spend 1 uninterrupted week with his children in more than 4 years; and neither their only living grandparent nor closest relatives have been able to receive them in their own homes anymore. Therefore, it is also the belief of this party that joint physical custody would represent a slight positive modification at the parenting and financial levels, based on a material change of circumstances persisting throughout the marriage with solid grounds in justice, so as to alter the court's finding in terms of fostering the prior order as to the best interests of the child (*in re*, *Hall v. Hall*, 186 Conn. 118, 122, 439 A.2d 447 (1982), among others).

In sum, it is a fact of reality the petitioner exercised due diligence in attempting to know the truth (*in re*, *Connecticut National Bank v. Voog*, 233 Conn. 352, 366-367, 659 A.2d 172 (1995)), and despite all the obstacles in his way within the boundaries of the concept of estoppel (*in re*, *Bozzi v. Bozzi*, 177 Conn. 232, 242, 413 A.2d 834 (1979); *Dupuis v. Submarine Base Credit Union, Inc.*, 170 Conn. 344, 353, 365 A.2d 1093 (1976); *Pet Care Products, Inc. v. Barnett*, 150 Conn. 42, 53-54, 184 A.2d 797 (1962); *Zoning Commission v. Lescynski*, 188 Conn. 724, 731, 453 A.2d 1144 (1982); *Kimberly-Clark Corporation v. Dubno*, 204 Conn. 137, 148, 527 A.2d 679 (1987); *O'Sullivan v. Bergenty*, 214 Conn. 641, 648, 573 A.2d 729 (1990)), he did remain true to, and consistent with, his word within the legitimacy of court orders and this entire process.

**10.** Attending the *status quo* and the decisions of the lower courts in a combined civil and criminal process of more than 4 years, the petitioner is of the belief the Memorandum of Decision under study is null and void, as long as it proclaims no fault on either party, grants joint custody of the children and splits the petitioner's assets in half between them. Still, the lower courts' interpretation of such memorandum has precluded the petitioner from freely resorting to and disposing of those assets from a financial standpoint, as well as from exercising his parental rights per historical standards (a fully committed father) in violation of multiple constitutional rights.

**11.** As a result of this process the petitioner has been unclothed of all his assets versus a party who does not need or deserve them in an equitable frame; illegally arrested and exiled from his adoptive country per institutional chicanery; persecuted and discriminated against for inexistent debts and ideological issues; subjected to defamation, libel, and slander; threatened with incarceration in a courtroom without proper counsel and declared in contempt to court when he was literally not; prevented from finding employment based on his experience, professional background and past income generating capacity; and, therefore, curtailed in the ordinary exercising of his parental role and rights per the very same orders of the lower court.

———————◆———————

## CONCLUSION

In light of the aforesaid, it is hereby requested the petition for a writ of certiorari to be granted.

Respectfully submitted on February 12, 2013.

> FERNANDO GABRIEL IRAZU, *Pro Se*
> 1340 Washington Boulevard,
>   Suite 504
> Stamford, CT 06902
> 203-570-8318
> fgirazu@gmail.com

i

## INDEX TO APPENDICES

Page

APPENDIX A: *Margarita Oliva Sainz de Aja v. Fernando Gabriel Irazu*, Appellate Court of the State of Connecticut (139 Conn. App. 904 [AC 34364]), November 13, 2012.............App. 1

APPENDIX B: *Margarita Oliva Sainz de Aja v. Fernando Gabriel Irazu*, FSTFA094017497S, Memorandum of Decision, September 2, 2010.................................................................App. 2

APPENDIX C: *Margarita Oliva Sainz de Aja v. Fernando Gabriel Irazu*, No. PSC-12-0235, Order on Petition for Certification to Appeal, Supreme Court of Connecticut, December 18, 2012 ...............................................................App. 12

APPENDIX D: *Margarita Oliva Sainz de Aja v. Fernando Gabriel Irazu*, FSTFA094017497S, Court Order, February 17, 2012...................App. 14

APPENDIX E: *State of Connecticut v. Fernando Gabriel IRAZU*, Motion to Erase, CRO90165772S-CRO90168728S, Superior District Court of Stamford at Norwalk, January 30, 2012 .........................................................App. 15

App. 1

## APPENDIX A

MARGARITA OLIVA SAINZ DE AJA
*v*. FERNANDO GABRIEL IRAZU
(AC 34364)

Beach, Robinson and Alvord, Js.

Submitted on briefs October 12 –
officially released November 13, 2012

Defendant's appeal from the Superior Court in the judicial district of Stamford-Norwalk, *Hon. Dennis F. Harrigan*, judge trial referee; *Wenzel, J*.

Per Curiam. The judgment is affirmed.

_____

App. 2

## APPENDIX B

| | |
|---|---|
| FST FA 09 4017497 S | : SUPERIOR COURT |
| MARGARITA OLIVA SAINZ DE AJA | : JUDICIAL DISTRICT : OF STAMFORD/ |
| V. | : NORWALK : |
| FERNANDO GABRIEL IRAZU | : AT STAMFORD : SEPTEMBER 2, 2010 |

### <u>MEMORANDUM OF DECISION</u>

The plaintiff wife, 40, and the defendant husband, 41, married in New York City on October 18, 1995. The residency requirement of Conn. Gen. Stat. § 46b-44(c) has been satisfied by the plaintiff who has been a resident of this state for at least twelve months next preceding the date of the filing of the complaint seeking a decree of legal separation and additional orders. The plaintiff subsequently amended her request to a decree of dissolution (137). The parties have three children issue of the marriage, V., [age omitted], M., [age omitted], I., [age omitted].

The plaintiff was born and educated in Spain, graduating from Granada school of Law in 1992 with a J.D. degree. She became an instructor at the school for the ensuing two years while she pursued a Ph.D. She enrolled in Harvard Law School, class of 1995, for an LL.M degree. She then began a career in international law in New York. After V. was born in late 19xx she returned to work. A live in nanny was employed for five years.

The defendant is an international banker. He is from Argentina where he was educated. He and the

App. 3

plaintiff first met in 1994. On their joint IRS form 1040 for 2008 (Pl. Ex. #5) he reported total wages of $717,979 received from HSBC Securities. She reported receiving $141,576 wages from Allen & Overy LLP and $63,717 additional wages from her law firm. For 2007 (P. Ex. #7) the plaintiff's W-2 issued to her by Allen & Overy LLP listed wages as $347,743 and the defendant's W-2 issued by HSBC listed his wages as $84,732. The defendant is currently unemployed. Despite the earning capacity he demonstrated in the recent past it was not shown that he is avoiding available employment in the international banking industry. The court cannot apply earning capacity without a demonstration that there is work available to him.

The parties purchased a home in Greenwich, Connecticut known as 10 Indian Pass in 1997 for $700,000 with a mortgage of $139,000. An appraisal valued the parcel at $1,180,000 as of February 5, 2010 (Pl. Ex. #2). The plaintiff continues to reside there with the children. The defendant moved out for the final time at the end of September 2009, to an apartment in Old Greenwich.

The causes of the breakdown of the marriage appear to the court to be the parties' inability to cooperate concerning decisions regarding their goals, their children's welfare and the fulfillment of their respective careers. The court finds that each party must bear some responsibility for the irretrievable breakdown.

App. 4

A proposed parental responsibility plan was submitted to the court by the plaintiff dated May 28, 2010 (138). The plaintiff affirms that it is their intention to mutually and flexibly cooperate and co-parent the children keeping the children's best interests as their primary concern. The court finds that the proposal meets the considerations described in Conn. Gen. Stat. § 46b-56(c) in making the orders for custody and has concluded the proposal satisfies the provisions of Conn. Gen. Stat. § 46b-56. The court has reviewed the proposed orders submitted by the defendant (145) and (148) concerning custody but finds the plaintiff's proposal more appropriate.

Having reviewed the evidence in light of the relevant statutes and case law the court renders judgment dissolving the marriage on the ground of irretrievable breakdown. The following orders are included as part of the decree.

1. No alimony is awarded to the husband. The husband shall pay to the wife the sum of one dollar per year alimony until the first to occur of a modification pursuant to Section 46b-86, the death or remarriage of the wife or June 1, 2020.

The parties shall have joint legal custody of the minor children. The primary residence of the children will be with the wife. The court finds that it is their intention to mutually and flexibly cooperate and co-parent the children, keeping the children's best interests as their primary concern.

App. 5

2. The husband shall immediately apply for unemployment compensation and, effective upon his receipt of the first payment to him of unemployment compensation, he shall pay to the wife child support for the three minor children as provided by the guidelines. On the first of each month, he shall provide to the wife a detailed report of his efforts to obtain employment, including any offer from a potential employer or headhunter.

In the event that the husband obtains employment, he shall notify the wife within ten days of his employment. Child support shall be modified on the husband's employment as provided by law.

In the event that the husband obtains employment, he shall pay a pro-rata share of the wife's child care expense and the cost of the children's activities based upon his income.

The parenting time for the husband with the children shall be as follows:

a. Wednesday nights overnight until Thursday morning;

b. Alternate weekends from Friday evening to Monday morning.

c. Monday night for dinner in the weeks when the children have been with the wife for the preceding weekend.

3. a. The Real Property at 10 Indian Pass, Greenwich, Connecticut is joint owned. The wife shall

App. 6

continue to have exclusive possession of the marital residence. The wife shall pay all monthly expenses of the residence including maintenance and repairs except that the parties shall each pay one-half of the property taxes pertaining to the residence. On or before April 1, 2021, the year in which the youngest child reaches 18, the parties shall list the property for sale with a real estate broker at the then fair market value of the property. The wife shall also have the right to list the property for sale at any time between the date of the Decree of Dissolution and April 1, 2021 and the husband shall cooperate. The husband may demand an immediate sale upon the wife's remarriage, or cohabitation without proof of change in finances as required by Conn. Gen. Stat. § 46a-56b. At the closing of title regarding the sale of the marital residence, the first mortgage, any broker's commissions and all normal closing costs shall be paid and the remaining proceeds shall be divided equally after a credit is paid to the wife for the difference between the balance on the first mortgage on the date of the Decree of Dissolution and the balance of the mortgage on the date of the closing regarding the sale of the residence. Any sums due to the wife pursuant to any orders of the court shall be paid to the wife at the closing from the husband's portion of the net closing proceeds.

b. The husband shall retain his one-quarter interest in an apartment in Buenos Aires, Argentina.

c. The wife shall retain her interest in a beach house in Spain, subject to her mother's life estate.

App. 7

d.   HSBC stock: all of the HSBC stock, including the shares which are still restricted, shall be divided equally between the parties. One-half of all of the shares which have been released to the husband in 2009 and 2010 shall be divided immediately by the transfer of one-half of the shares from the husband to the wife. The husband shall transfer one-half of the shares which shall be released to him in 2011 to the wife immediately upon the release of those shares to him.

e.   Joint HSBC savings account: The balance in this account shall be divided equally between the parties and the account shall then be closed.

f.   The sole accounts of the wife at Citibank shall remain her sole property. The sole account of the husband at Citibank shall be his sole property. The joint accounts of the parties at Citibank shall be closed.

g.   Morgan Stanley Smith Barney Account No. xxx413 and xxx448 shall be divided equally between the parties immediately.

h.   Retirement accounts: The husband's American Funds rollover IRA account xxx294, the husband's Vanguard HSBC Retirement Plan No. xxx317, the husband's Citigroup 401(k) and the wife's Allen Overy 401(k) account shall be divided equally by the transfer from the husband to the wife from the husband's American Funds IRA to an IRA in the name of the wife in the sum of $34,427.88, adjusted for any change in the total value of the retirement accounts

App. 8

due to market fluctuations from May 17, 2010, to the date of transfer.

The parties each shall have vacation time with the children as follows:

Each of the parties shall have one-half of the Christmas, February, March and April school breaks with the children.

Each of the parties shall have two weeks with the children during summer vacation.

These vacation periods shall supersede the regular parenting schedule and the regular parenting schedule shall resume at the end of each vacation period.

4.   The wife shall continue to provide medical insurance for the minor children as available through her place of employment. Each of the parties shall pay one-half of all of the unreimbursed medical and dental expenses of the minor children.

The wife shall have parenting time with the children at all times when they are not with the husband.

5.   a.   The wife shall continue to be the owner of Northwestern Mutual Term Life insurance policy on the life of the husband in the face amount of $1,000,000 for the benefit of the three children of the marriage until the youngest child reaches the age of twenty-three. The husband shall be solely responsible for all premiums due on said life insurance policy. In

the event that the husband fails to make a timely payment of a premium therefor, the wife shall have the right to pay the premium and to be immediately reimbursed by the husband therefor.

b. The wife shall continue to be the owner of a Northwestern Mutual term life insurance policy on her life in the face amount of $1,000,000 for the benefit of the minor children until the youngest child reaches age twenty-three. The wife shall be solely responsible for all premiums due on said life insurance policy. In the event that the wife fails to make a timely payment of a premium therefor, the husband shall have the right to pay the premium and to be immediately reimbursed by the wife therefor.

c. The terms of paragraph 5 shall be subject to modification by the court.

The husband and the wife shall discuss and confer with reference to matters of policy involving the children as to such topics as health, education, recreational activities, camps and colleges, and the parties will attempt to adopt a harmonious policy best suited for the best interests of the children.

6. The court shall retain jurisdiction in accordance with Section 46b-56c of the Connecticut General Statutes to enter orders for the educational support to the three children. The parties shall promptly execute all documents necessary to apply for a scholarship for the tuition of the parties' son M. at the Brunswick School and each of the parties will pay one-half of the tuition for Brunswick School for the

App. 10

school year 2010 to 2011 in excess of the scholarship. For the year 2011 and going forward, the parties will each pay one-half of the cost of any private school for any of the three children if they have agreed that the child will attend that private school.

If either party has knowledge of any illness or accident or other circumstances seriously affecting the health or welfare of said child, the husband or the wife, as the case may be, will promptly notify the other.

7. Each of the parties agrees to keep the other party currently advised of the other's residence and business addresses, telephone numbers and whereabouts of the children while said child is with the husband or the wife.

8. Either parent may apply for an Argentinean passport or Spanish passport for any of the children and the parties shall cooperate.

9. The husband shall indemnify and hold harmless the wife against all claims and all liability arising out of any business activity in which he has been involved during the marriage of the parties, including but not limited to Knightsbridge Partners LLC, KP Foods, LLC, KP Capital, LLC, The Knightsbridge Universal Group, Inc., Knightsbridge Development Investments, Inc., Kent partners, Inc. and KP Ventures Ltd. He shall immediately remove the wife from any and all capacities with respect to all such entities, including officer, director, member or any other

App. 11

capacity and henceforth he shall not name her in any capacity.

10.   Except as provided in the orders pertaining to the residence, each of the parties shall be solely responsible for their own liabilities.

BY THE COURT

/s/  Harrigan J.T.R.
       HARRIGAN, J.T.R.

[Decision entered in accordance
with the foregoing. All counsel
and pro-se parties of record notified
on ~~August~~ September 2, 2010
          /s/ LM TAC]

App. 12

**APPENDIX C**

**SUPREME COURT**

**STATE OF CONNECTICUT**

NO. PSC-12-0235

Margarita Oliva Sainz de Aja

v.

Fernando Gabriel Irazu

**ORDER ON PETITION FOR
CERTIFICATION TO APPEAL**

On consideration of the petition by the defendant for certification to appeal from the Appellate Court (139 Conn. App. 904 [AC 34364]), it is hereby ordered that said petition be, and the same is hereby denied.

BY THE COURT,

/s/ Alan M. Gannuscio
ALAN M. GANNUSCIO
ASSISTANT CLERK-APPELLATE

Dated: 12/18/2012
Notice Sent: DECEMBER 18, 2012
Clerk, Superior Court, Stamford/Norwalk,
  FA 09 4017497
Clerk, Appellate Court
Reporter of Judicial Decisions
SAO
Fernando Gabriel Irazu, self represented party
Margarita Oliva Sainz de Aja, self represented party
Ramer & Ramer

App. 13

Fernando Gabriel Irazu, self represented party, in support of petition.

———————————————————

App. 14

**APPENDIX D**

**Margarita Oliva Sainz De Aja v.
Fernando Gabriel Irazu**

**FSTFA094017497S**

**Court Order**

**– February 17, 2012**

"**THE COURT**:   I must tell you that that relates to the motion to contempt. That is something that again, right or wrong, I made a decision. And if that's not a good decision, then you have your right to appeal . . . [ ] . . . Well, if at any time you think that any decision I make is wrong, you have the right to appeal. And if I do make a bad decision, an incorrect decision, I want that to be fixed as much as anyone else. So please, feel free if you need to take an appeal, you should do so. I don't take any offense at that. Many people, many lawyers do it here. I get used to it. Okay?",

**BY THE COURT**

**s/. Wenzel, William, J.**

_____

App. 15

## APPENDIX E

| | | |
|---|---|---|
| CRO90165772S – CRO90168728S | ) | SUPERIOR COURT |
| STATE OF CONNECTICUT | ) | J.D. OF STAMFORD/ NORWALK |
| V. | ) | |
| FERNANDO GABRIEL IRAZU | ) | AT STAMFORD |
| | ) | January 13, 2011 |

### MOTION FOR RETURN AND DESTRUCTION OF FINGERPRINTS, ARREST CARD, PHOTOGRAPHS, PHYSICAL DESCRIPTION, ELECTRONIC RECORDS AND ANCILLARY DOCUMENTATION

Fernando Gabriel IRAZU, self-represented, on the above-referenced matters, which were dismissed, unsubstantiated and positively resolved without trial, hereby files on due time this **MOTION FOR RETURN AND DESTRUCTION** in order for the Greenwich Police Department as well as all applicable State and Federal agencies to return and destroy any fingerprints, arrest cards, photographs, physical description, electronic records as well as any ancillary documentation and/or information related to them (cf. Sec. 29-15, General Statutes of Connecticut).

As required by law, this Motion does not pertain to any plea arrangement, trial and/or sentence before the Superior Court of Stamford or otherwise, rather an overall situation triggered within and for the occasion of a lengthy and protracted marital dissolution

App. 16

process. Thus, the petitioner respectfully moves this Court within such frame.

During the trial pursued by the other party in the marital dissolution process, the opinion of the Court, on the criminal actions unduly initiated against the petitioner, was heard via the sayings of the late Honorable Judge Dennis F. Harrigan:

> "**THE COURT:** The charges, whatever they were, have all been expunged. The file has been sealed. The arrest record of your arrest should be expunged also. I don't know whether you have to move – file a motion for that, but – . . . . **MR. IRAZU:** Thank You, Your Honor.", *Official Transcripts in re Oliva Sainz de Aja, Margarita v. Irazu, Fernando Gabriel, FST-FA-09-4017497-S, Superior Court, Judicial District of Stamford/Norwalk, at Stamford, Connecticut, June 4, 2010, Trial Before Honorable Judge Dennis F. Harrigan, Judge, 93.*

As to the petitioner, he is a devoted and committed father and no criminal record of any kind in his entire life, as well as a former investment banker and a non-practicing attorney who might be required from time to time to produce fingerprints and statements under oath before various federal and/or state agencies, among other situations corroborating under oath that he has in fact no criminal record whatsoever related to this ignominy.

Such overall marital dissolution process, within this very same context, has profoundly damaged the

App. 17

petitioner's professional career, hurt his own and extended family, as well as at the time seriously impacted his wellbeing.

DATED at Stamford, Connecticut, on January 13, 2012.

By /s/ Fernando Gabriel Irazu

Fernando Gabriel IRAZU

Self-represented

Billinghurst 1656, 2 A

Buenos Aires, 1425

ARGENTINA

1 203 570-8318

fgirazu@gmail.com

[Granted 1-30-12
(Comeford, J)
/s/ [Illegible]
   Clerk]

———————————————

App. 18

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been delivered on January 13, 2012 to the State Attorney.

/s/ Fernando Gabriel Irazu

Fernando Gabriel IRAZU

Pro-se

# **APPENDIX B**

Petition for Writ of Certiorari before the US Supreme Court of Justice dated 4/15/2019 (Exhibit G to Motion for Clarification and Objection of 6/2/2021 # 15).

No. _____

_____

# In The
# Supreme Court of the United States

──────────── ❖ ────────────

FERNANDO GABRIEL IRAZU,

*Petitioner,*

vs.

MARGARITA OLIVA SAINZ DE AJA,

*Respondent.*

──────────── ❖ ────────────

**On Petition For Writ Of Certiorari
To The Appellate Court Of The
State Of Connecticut**

──────────── ❖ ────────────

**PETITION FOR WRIT OF CERTIORARI**

──────────── ❖ ────────────

FERNANDO GABRIEL IRAZU, *Pro Se*
34 Boulder Brook Road
Greenwich, CT 06830-3514
203-570-8318
fgirazu@gmail.com

_____

i

# QUESTIONS PRESENTED

This is a parental rights case where international private law and constitutional law intersect with ramifications of exceptional relevance for US legal policy worldwide and the functioning of the domestic legal system.

Specifically, this case addresses a *pro se* father's rights and the need to protect US jurisdiction and laws as well as to enforce final US judgments internationally –in tandem with foreign *exequatur* proceedings under Continental Law–, all in light of his rights to due process and to be timely heard in the context of his unequal treatment under the law.

**1.** Did the lower court infringe the Petitioner's parental rights and due process by ignoring the Court's unanimous precedent, *in re, Chafin v. Chafin*, as a result of the Respondent attacking the final US divorce judgment and orders via a subsequent fraudulent and concealed contentious divorce action in Spain, among other relief related to minor children?

**2.** Did the lower court infringe the Petitioner's parental and property rights by perpetuating a *status quo* of contempt to court and fraud by the Respondent, thus granting the latter a *de facto* sole custody award while terminating this party's parental rights, all through due process violations and an unequal treatment under the law (never proper proceedings per local normative)?

ii

## QUESTIONS PRESENTED – Continued

**3**.   Did the lower court infringe the Petitioner's parental and property rights by applying the law in a biased, partial and unequal fashion? In this regard, did the lower court also infringe the Petitioner's due process by not disqualifying the district court judge, reversing her rulings, and ordering the transfer of any further proceedings to federal venue?

**4.**   Did the lower court ignore the constitutional claims posed by the Petitioner as well as all records, facts, and applicable law in this case, including undisputed evidence proving abuse of process, false criminal charges and illegitimate advancement of civil claims, a spurious civil restraining order with nationwide reach under federal punishment, the curtailment of this party's parental and property rights, unethical and criminal conduct, as well as lack of proper counsel, police brutality, harassment, and persecution through state-related institutions?

iii

## LIST OF PARTIES

Fernando Gabriel IRAZU, Petitioner *Pro Se*
210 East 68th Street, Apt. 14 H
New York, New York 10065
203-570-8318
fgirazu@gmail.com


Margarita OLIVA SAINZ de AJA, Respondent
Attorney at Law
10 Indian Pass Greenwich, CT 06830
203-861-9520
m.olivasainz@gmail.com

iv

# TABLE OF CONTENTS

Page

PETITION FOR WRIT OF CERTIORARI................1

STATE COURT OPINIONS.....................................1

JURISDICTION.............................................................2

CONSTITUTIONAL AND STATUTORY
PROVISIONS. ...........................................................2

STATEMENT OF THE CASE......................................3

1.    Protection of US Jurisdiction and Laws, and
Enforcement of Final US Judgments Internationally;
Parental and Property Rights; Unequal Treatment
Under the Law and Abuse of Process.......................3
2.  Basic Factual Timeline.......................................6

REASONS FOR GRANTING THE PETITION.........19

1.    US Public Policy Issue of Exceptional
Importance: International Private Law and Foreign
*Exequatur* Proceedings; Protection and Enforcement
of US Jurisdiction, Laws and Final Judgments;
Conflict with Precedent of the Court Per *Chafin v.
Chafin*...............................................................19
2.    Fundamental Rights and Strict Scrutiny: *de
facto* Termination of Parental Rights, Property
Rights, Lack of Due Process, and Unequal Treatment
Under the Law...................................................23
3.    Disqualification of *Judge Heller* and Transfer to
Federal Venue: Prejudgment and Unequal Treatment
...................................................................25

## TABLE OF CONTENTS - Continued

4.    Curtailment of Parental and Property Rights Through Abusive Pattern within the Legal System: Nationwide Civil Restraining Order and Constitutional Violations…………..….…………….28

CONCLUSION............................................................34

INDEX TO APPENDICES

APPENDIX A:   Supreme Court of the State of Connecticut Order on Petition for Certification, 3/13/2019 (PSC 18-0347)………………...….…………A-1

APPENDIX B: Appellate Court of the State of Connecticut, State of Connecticut, 2/12/2019 (187 Conn. App. 902) (AC 41455, *Heller, J;* AC 41598, *Genuario, J;* and AC 42118, *Truglia, J*)……………A-2

APPENDIX C: Superior District Court of Stamford / Norwalk, Connecticut, 3/2/2018 and 5/14/2018, *Heller J;* 4/24/2018, *Genuario, J;* 9/12/2018, *Truglia, J*….A-3

APPENDIX D: Superior District Court of Stamford /Norwalk, Connecticut, Stipulation, 6/10/2016 *(Tindill, J)* ……………..……………………………...A-23

APPENDIX E:  Superior Disctrict Court of Stamford / Norwalk, Connecticut, Order Re. Mot # 153, 11/22/2010 *(Malone, J)*………………….…………A-27

APPENDIX F: Superior District Court of Stamford / Norwalk, Connecticut, Memorandum of Decision, 9/2/2010 (*Harrigan, J,* incorporating Orders of Marital Dissolution*, Malone, J*)…………………….A-30

vi

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Chafin v. Chafin,* 133 U.S. 1017, 185 (2013)……..……
……………………………………................18, 19, 22
*Troxel v. Granville*, 530 U.S. 57 (2000)……………………
……………………………………………18, 19, 23, 24, 25
*Santosky v. Kramer*, 455 U.S. 745 (1982) ………...23, 25
*Meyer* v. *Nebraska,* 262 U.S. 390, 399, 401 (1923)…….
……………………………………………………23, 25
*Pierce* v. *Society of Sisters,* 268 U.S. 510, 535 (1925)….
………………………………………………………23, 25
*Armstrong v. Manzo*, 380 U.S. 545 (1965)……….23, 25
*Stanley v. Illinois*, 405, U.S. 645, 651 (1972)………..
……………………………………………………23, 24,25
*Wisconsin* v. *Yoder,* 406 U.S. 205, 232 (1972)…..23, 24
*Quilloin v. Walcott*, 434 U.S. 246, 255 (1978)………
……………………………………………………23, 24, 25
*Parham v. J. R.*, 442, U.S 584, 602 (1979) ………23, 25
*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) …
……………………………………………..………23, 25
*Stanton v. Stanton*, 421 U.S. 7, 10 (1975) ……….24, 25
*United States v. Virginia,* 518 U.S. 515 (1996)....24, 25
*Caban v. Mohammed*, 441 U.S. 380 (1979) ….....24, 25
*May v. Anderson*, 345 U.S. 528 (1952) …………........25
*Byars v. U.S.*, 273 US 28 (1927) ………………………25
*Murchison*, 349 U.S. 133, 136 (1950). ....……………25
*Caperton v. A.T. Massey Coal* Co, 129 S. Ct. 2252, 2259 (2009) ……………………………………………25
*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)………….....25
*United States v. Brown,* 72 F.3d 25, 29 (5th Cir. 1995)... ………………………………………………26

### TABLE OF AUTHORITIES - Continued

*Jenkins v. McKeithen*, 395 U.S. 411 (1969) ……...…26

*Hannah v. Larche,* 363 U. S. 420 (1960) …………...26

*United States District Court v. Sandlin*, 12 F.3d 861 (9th Cir.1993) …..……….…………………….…27

*Standing Committee on Discipline of U.S. District Court for Central District of California v. Yagman,* 55 F 3d. 1430 (CA 9, 1995)…………..……………27

*United States v. Morrison*, 529 U.S. 598 (2000)……..30

*Matthews v. Eldridge,* 424 U.S. 319 (1976) ……….…31

*Connecticut v. Doehr*, 501 U.S. 1 (1991) …………….31

*Haines v. Kerner*, 404 U.S. 519 (1972)………….…..32

*Boddie v. Connecticut*, 401 U.S. 371 (1971) ……..…32

*Miranda v. Arizona,* 384 U.S. 436 (1966) …………...32

*Graham v. Connor,* 490 U.S. 386 (1989) ……….…..32

*Malley v. Briggs,* 475 U.S. 335 (1986)…………….…32

*Cuyler v. Sullivan* 446 U.S. 335 (1980) ……….…….32

*Burdeau v. McDowell*, 256 U.S. 465 (1921)….………32

*Walder v. Unites States,* 347 U.S. 62 (1954) …………32

*Klopfer v. North Carolina*, 386 U.S. 213 (1967)……..32

*Castle Rock v. Gonzales (contrario sensu)*, 545 U.S. 748 (2005)………………………………………….32

*Del Marcelle v. Brown County Corp. (contrario sensu),* 680 F.3d 887 (7th Cir. 2012)……..…………33

*Ng Fung Ho v. White*, 259 U.S. 276 (1922)….………33

*Sessions v. Dimaya*, 584 U.S. (2018)……………..…33

*Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. (2018)…………………………33

*Timbs v. Indiana*, 586 U.S. (2019) ………………….33

viii

## TABLE OF AUTHORITIES - Continued

Page

### State Cases

*Cashman v. Cashman*, 41 Conn. App. 382, 676 A.2d 427 (1996)………………….……………………………22

*Zitkene v. Zitkus*, 140 Conn. App. 856, 60 A. 3d 322 (2015)……………………………………….…………..22

*Lindo v. Lindo*, 48 Conn. App 645, 710 A.2d 1387 (1998)…………………………………………………………22

*Van Wagner v. Van Wagner*, 1 Conn. App 578, 474 A.2d 110 (1984)…………………...……..……………22

*Burton v. Burton*, 189 Conn. 129, 454 A.2d 1282 (1983)…………………………………………………………22

*Morabito v. Wachsman*, 191 Conn. 92, 463 A.2d 593 (1983)…………………………………………………22

*Gillis v. Gillis*, 214 Conn. 336, 343, 572 A.2d 323 (1990) ………………………………………………………..25

*Adams v. Adams,* 93 Conn. App. 423, 426, 890 A.2d 575 (2006)…………………………………………………25

*Cameron v. Cameron,* 187 Conn. 163, 170, 444 A.2d 915 (1982)……………………………………………...25

*State v. Stanley*, 161 Conn. App. 10, 32, 125 A. 3d 1078 (2015)…………………………………………………25

*Hawley v. Baldwin*, 19 Conn. 585, 590 (1849)…..……25

*McKenna v. Delente*, 123 Conn. App. 137, 144–45, 1 A.3d 260 (2010) ...……………………………………..…26

*Mulholland v. Mulholland*, 229 Conn. 643, 649, 643 A.2d 246, 249 (1994) ………………………………………26

*Kasowitz v. Kasowitz,* 140 Conn. App. 507, 59 A.3d. 347 (2013) ……………………………………………………26

*Landry v, Spitz*, 102 Conn. App. 34, 42-43 (2007)…..26

## TABLE OF AUTHORITIES - Continued

*Billington v. Billington*, 220 Conn. 212, 217-18, 595 A.2d 1377 (1991)…………………………………………..26

*Reville v. Reville*, 312 Conn. 428, 442, 93 A3d 1076 (2014) …………………………………………………...…26

*Cimino v. Cimino*, 174 Conn. App. 1, 9-10 (2017)…...26

*Oneglia v. Oneglia*, 14 Conn. App. 267, 271-272, 540 A.2d 713 (1988) ...…………………………….............26

*Burton v. Mottolese*, 267 Conn. 1, 51 (2003)….....…27

*Statewide Grievance Committee v. Burton,* 299 Conn. 405 (2011)…………………………………………………27

*Putnam v. Kennedy*, 104 Conn. App. 26, 34, 932 A.2d 434 (2007)……………………………….…………29

*Jordan M. v. Darric M.*, 168 Conn. App. 314, 319, 146 A.3d 1041 (2016)………………………………………29

*Rosemarie B-F. v. Curtis P.*, 133 Conn. App. 472, 477, 38 A.3d 138 (2012) ...…………………….………..…29

*Marriage of Evilsuzor v. Sweeney*, 237 Cal. App. 4th 1215 (2015)...…………………………………...……29

*Hogue v. Hogue,* 16 Cal. App. 5th 833 (2017) ............29

*Nevarez v. Tonna*, 227 Cal. App. 4th 774 (2014)…......29

*Burquet v. Brumbaugh*, 223 Cal. App. 4th 1140 (2014) ………………………………………………………..29

*Putnam v. Kennedy*, 279 Conn. 162, 900 A.2d 1256 (2006)……………………………………….…………31

## IN THE SUPREME COURT OF THE UNITED STATES

### PETITION FOR WRIT OF CERTIORARI

The petitioner respectfully prays for a writ of certiorari issue to review the judgment from the State courts below.

### STATE COURT OPINIONS

A copy of the decision of the Supreme Court of the State of Connecticut denying the Petition for Certification (PSC 18-0347) from the ruling of the local Appellate Court is dated 3/13/2019, unpublished, and appears as Appendix A.

A copy of the decision of the Appellate Court affirming the district court rulings enumerated below (AC 41455, *Heller, J;* AC 41598, *Genuario, J;* and AC 42118, *Truglia, J*)[1] is dated 2/12/2019, published (187 Conn. App. 902), and appears as Appendix B.

A copy of the rulings of the local district court appears as Appendix C, namely:

(i) motions for contempt and fraud for violation of parental and patrimonial rights, also in the context of a subsequent fraudulent and concealed divorce process in Spain (3/2/2018 and 5/14/2018, *Heller J);*

---

[1] Post-denial of the Petition for Certification by the Supreme Court of the State of Connecticut, the Appellate Court reversed its decision as to AC 42118 *(Truglia, J),* and this case is pending of resolution.

(ii) disqualification of *Honorable Donna Heller, Judge,* for biases and partiality as well as request for transfer of any further proceedings to federal venue (4/24/2018, *Genuario, J)*; and

(iii) civil restraining order with nationwide reach in the midst of appellate proceedings (9/12/2018, *Truglia, J*).

A copy of the latest court-mandated Stipulation *(Tindill, J)* is dated 6/10/2016 and appears as Appendix D.

A copy of the Memorandum of Decision (*Harrigan, J,* incorporating Orders of Marital Dissolution*, Malone, J*) ruling on the divorce of the parties is dated 9/2/2010 and appears as Appendix F.

## JURISDICTION

The jurisdiction of this Court is invoked under 28 U.S.C. §1257 on a timely basis per final State courts' ruling above.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

First, Fourth, Fifth, Sixth, Eight, Ninth, and Fourteenth Amendments, United States Constitution.

Conn. Gen. Stat., § 45a-717, (a) through (k).

Parental Kidnapping Prevention Act, 28 U.S.C., §1738 A (b) and (f).

Uniform Child Custody Jurisdiction and Enforcement Act, Chapter 1, § 102-105, Chapter 2, § 201.

Hague Convention on the Civil Aspects of International Child Abduction, Articles 2-5.

US Department of State, US Customs and Border Protection Guidelines.

Connecticut Practice Book, *Code of Judicial Conduct*, Canon 2, Rules 2.2, 2.3, 2.11.

Connecticut Practice Book, *Rules of Appellate Procedure*, § 60-1.

Conn. Gen. Stat., § 46b-15 (a).

18 U.S. Code § 2265. *Full Faith and Credit Given to Protection Orders*.

18 U.S. Code § 2262. *Interstate Violation of Protection Order*.

## STATEMENT OF THE CASE

**1. Protection of US Jurisdiction and Laws, and Enforcement of Final US Judgments Internationally; Parental and Property Rights; Unequal Treatment Under the Law and Abuse of Process**.

At the core this is a family law case encompassing international private law and constitutional law from different angles, which as a whole embarks on matters of exceptional relevance regarding US public policy and the overall functioning of the legal system.

The parties are US citizens; the Petitioner was born in Buenos Aires, Argentina; and the Respondent was born in Granada, Spain. The parties married in

4

New York City on 10/6/1995; the Respondent recorded the US marriage of the parties in the Spanish consulate of New York City on 10/17/1995; a religious ceremony under the Catholic faith took place in Granada, Spain, on 5/18/1996; and three children were born in the US out of their union: a girl (11/4/1998); a boy (7/31/2000); and a girl (5/26/2003).

The parties divorced at the Superior District Court of Stamford/Norwalk, Connecticut, on 9/2/2010. At the Petitioner's request, on 1/26/2016 the Ecclesiastical Tribunal from the Diocese of Bridgeport, Connecticut, granted an annulment of the parties' religious marriage.

The petitioner was deemed a loving and outstanding father by the district court[2] and the Respondent;[3] he was granted joint legal custody of his children; and specific co-parenting rights and duties were mandated. In exchange for co-parenting, the Respondent retained residence of the family home – acquired with the fruit of the Petitioner's exclusive effort– for a set period of time and under certain conditions.[4]

---

[2] "COURT: … There is no question in my mind that they're both loving parents and that's been clearly demonstrated in this courtroom...", *Divorce Trial before late Judge Harrigan*, 6/16/2010, page 17.

[3] Margarita Oliva Sainz de Aja, *Divorce Trial before late Judge Harigan*, 6/10/2010, page 47; *"Throughout the years, Fernando has been a good husband, has shown an exceptional dedication to his family and is an outstanding father"*, Letter from Margarita Oliva Sainz de Aja to *Honorable Robert John Malone, Judge*, 4/2/2009; id. 8.

[4] Appendices D and F.

The rulings subject to review ignored the aforesaid, and perpetuated a *status quo* of contempt to court and fraud from the other party of several years. This *status quo* implies the termination of the Petitioner's parental rights by *de facto* granting a sole custody award to the Respondent with no legal recourse, after two of the three children having reached legal age during these delayed proceedings.

The present outcome is particularly due to the unequal treatment under the law of a *pro se* father confronting state-driven illegalities as well as unethical and criminal conduct of various parties, which include a subsequent fraudulent and concealed divorce process in Spain that was declared null and void after the Petitioner discovered such scheme and proceeded to enforce the US divorce judgment and orders via an *exequatur*.

The Respondent continued her abusive pattern of advancing civil claims illegitimately, and pursued a nationwide restraining order against the Petitioner in the midst of the local appellate process, which further curtailed this party's parental and property rights.

The Petitioner's updated request for relief before the lower court, also in light of all constitutional concerns detailed herein, was denied the same day oral arguments took place before the Appellate Court.[5]

---

[5] *Motion for Reconsideration En Banc with Appendix* (denied 1/22/2019), 1/18/2019; *Amended Request For Relief* (denied 1/9/2019), 12/19/2018, Appellate Court.

## 2. Basic Factual Timeline.

**2009-10**. These proceedings were triggered in early 2009 with false criminal allegations of abuse against the Petitioner that were dismissed, discarded and/or unsubstantiated as a result of rulings from the district criminal court as well as the opinion from the *Department of Children and Families*[6] and the late divorce trial judge himself (*Harrigan, J*).[7]

The Petitioner endured multiple proven illegalities from the Greenwich Police Department as well as Greenwich Firefighters, among others within the State of Connecticut. The Petitioner suffered a cardiac arrest and was hospitalized in Greenwich.[8]

**2010**. In 2010, the Petitioner was prompted to act *pro se* during a divorce trial centered on criminal allegations, and the trial judge honorably advised him to get his record expunged *(Harrigan, J)*.[9] Although the Petitioner *pro se* later had his record fully expunged by the local criminal court,[10] the long-lasting damage was done. His good name, honor, reputation, professional career, as well as patrimony have all been decimated.

---

[6] Letter of 2/20/2009 from the *Department of Children and Families*, State of Connecticut, Ethel Moore, Social Worker-Investigation.

[7] Transcripts, *Divorce Trial before late Judge Harrigan*, 6/4/2010, page 93.

[8] *Appendix to the Defendant-Appellant's Brief,* A 115-463, AC 42118, cross-referenced per *Appendix to Motion to Consolidate and Order,* 9/24/2018, AC 41455, and *Communication to the Court*, 1/10/2018, AC 42118 / AC 41455, Appellate Court; among others.

[9] Id. 7.

[10] *Court Order of 1/30/2012 (Comeford, J)*, CRO90165772S and CRO90168728S, *State of Connecticut v. Fernando Gabriel Irazu*.

During the divorce trial, the shared religious beliefs of the parties represented an issue for the local court.[11] Orders of marital dissolution were entered into by the presiding judge in the criminal process *(Malone, J)*. The divorce decree deemed both parties equally responsible for their marital breakdown, and mandated mutual and flexible co-parenting of the minor children under joint legal custody. All marital assets were divided in equal stakes. The Respondent received $1 as alimony.[12]

Even after the conclusion of the divorce process, the local prosecutor protracted such spurious criminal proceedings. Although this ignominy came to an end due to the Petitioner's *pro se* efforts, as a US citizen and without any plea bargain he was still compelled to "self-deportation" to his country of origin Argentina.[13]

**2010-13.** In 2010, the Petitioner quickly complied with all financial orders in excess. While he was abroad, the district court *(Malone, J)* denied any clarifications of his rights; sequestered $27,000 of his exclusive property and designated Attorney Kevin Collins as trustee of those funds; as well as modified the $1,000,000 life insurance policy on each of the parties' lives for the exclusive ownership of the

---

[11] "COURT: No politics. No religion. Does that make sense to you?", *Divorce Trial before late Judge Harrigan,* 6/10/2010, page 63 ; "Q: Over the last decade, has your husband displayed very firm religious commitments? A: Yes, you have; and they were all shared by me.", *Divorce Trial before late Judge Harrigan*, 6/4//2010, pages 58, 129.

[12] Appendix F.

[13] Id. 113, 116-117.

Respondent.[14] In 2011, the Petitioner was erroneously declared in contempt for non-existent debts after a *capias* being issued while he was exiled in Argentina, only for the officiating judge to later advise him to appeal his own ruling *(Wenzel, J)*,[15] which concluded with a *Petition for Writ of Certiorari* before the Court.

**2014-15**. In 2014, the Petitioner established a *Child-Support Obligations Trust* before the district court in the amount of $250,000 via his equity in the family home, all based on a budget exclusively produced by the Respondent and Attorney Kevin Collins –by now a contentious party counsel who denied the existence of this budget on record.[16] Regardless of such guarantee, in 12/2015 the Respondent sued the Petitioner for child support, educational support orders, and welfare. The Respondent is a sophisticated NY and Spanish qualified attorney, a senior partner at Baker McKenzie in New York City,[17] the owner of various real estate properties, and holder of relevant investments and savings.

**2016-17**. On 6/10/2016, the parties settled all differences through a court-mandated Stipulation *(Tindill, J)*.[18] The Petitioner increased his commitment to $400,000 with additional equity in the family home, and co-parenting was at the center of

---

[14] Order #153, *Appendix to the Defendant-Appellant's Brief,* A 104-108, AC 41455, Appellate Court; Appendix E.

[15] *Hearing before Judge Wenzel*, 2/17/2012, pages 35, lines 1-5; 36, 1-8.

[16] Representation of Attorney Kevin Collins, *Hearing before Judge Heller*, 7/11/2017, pages 21-22; Exhibit A, *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

[17] Exhibit K, *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

[18] Appendix D.

any consideration. The Petitioner was immediately stonewalled in all co-parenting.[19] This party contends he was induced under false pretenses to enter into such agreement for the exclusive financial benefit of the other side.

One week after executing this Stipulation, on 6/17/2016, the Respondent sued the Petitioner for contentious divorce in a concealed and fraudulent fashion in Spain, resorting to false marriage data, domiciles and residences, as well as documentation.[20] The Petitioner argued the marriage of the parties in New York City of 10/6/1995 in fact took place in Spain, and established the last marital domicile and residences of the parties in Spain –all in one of the properties inherited by the Respondent in this country–,[21] when they had only resided as a couple in the United States and every member of the family is a US citizen despite holding Spanish nationality. Without such array of falsehoods, under Spanish law,[22] proper jurisdiction and competence would have

---

[19] "COURT: All right. To the extent this document talks about a pattern of conduct, which is what Mr. Irazu has been testifying about, I will allow it as a full exhibit. I'm going to disregard the post-motion events, but there are statements in here from Mr. Irazu about -- such as I asked you to confer with me about it, but you ignore my requests over and over again. So to that extent, I will take it as a full exhibit.", *Hearing before Judge Heller*, 7/13/2017, page 44, lines 13-21; Exhibits L, M, Q, S, T, U, V, KK, LL, EE, FF, MM, HH, AA, JJ, *Hearings before Judge Heller,* 7/11-13/2017, Exhibits A and B, 1/26/2018, id.5.

[20] Exhibits D, E, and N, *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

[21] Exhibit N, *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

[22] Spanish Constitution, articles 25 and 12; Spanish Law of Civil Procedure, *Of Matrimonial and Children Proceedings*, *Competence*, article 769; Spanish Civil Code, articles 40, 49, 86.

never been activated: the Respondent needed a fraud to obtain custody orders over minor children under Spanish jurisdiction and laws, as well as improper financial and patrimonial benefits.

The Petitioner fortuitously discovered this fraud a year later through official correspondence from the Spanish court sent to the family residence in Connecticut and handed to him by his youngest daughter.[23] The Spanish court had been trying to locate the Petitioner around the world, while the other party contented she did not know of his whereabouts and requested this foreign court to publish edicts in local newspapers to find him. Via this official correspondence, the Petitioner discovered the Spanish court had declared him in contempt to court for not answering summons he had never seen or received, set a date for a contentious trial with witnesses, and called for a prosecutor to take part of this process.

The Petitioner *pro se* requested the nullity of those fraudulent proceedings as well as an *exequatur* of the final US divorce judgment,[24] which were granted by the Spanish court.[25]

Only a month after executing such Stipulation in the United States, on 7/9/2016, the Respondent unilaterally enrolled the oldest daughter for college in Spain[26] –still a minor and already under Spanish

---

[23] Exhibits F and G, *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

[24] Exhibit H (marked for identification and later discarded by the district court), *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

[25] Exhibit C, *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

[26] Exhibit L, *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

jurisdiction and orders due to the Respondent's fraudulent divorce action there–, against court orders, the parties' prior understanding, as well as federal and international normative.[27] In 12/2016 the Petitioner, alleging fraud, pursued a motion for contempt and order against the Respondent –this motion was amended to reflect the discovery of the Spanish fraudulent and concealed divorce action.

**2017**. After half a year of unethical delays, hearings were conducted before *Judge Heller* in 2017. Those delays included cancelling the respective hearing presumably for this party having confounded the words plaintiff and defendant in his motion, when up to eight witnesses under subpoena were present before the lower court *(Colin, J)* –only three of those witnesses finally came back to testify–, as well as the attempt from the other side, in tandem with local officials, to preclude this party from ever getting to those hearings via a motion for abuse of process seeking to impose a *"leave to file protocol"* of any and all filings made by the Petitioner in the State of Connecticut.[28]

Those rescheduled hearings *(Colin, J)* took place in mid 2017 *(Heller, J),* and the Petitioner was precluded from mentioning the word fraud when he had argued such was in fact the case,[29] in general

---

[27] Id. 65.

[28] "COURT: … I think a lot of the relief you're looking for in this motion though you have poached it as a motion to open we have already had extensive evidence on. So I would like to look at that and the other motion that Attorney Collins mentioned [abuse of process and "leave to file" protocol]…", *Hearing before Judge Heller*, 11/27/2018, page 12, lines 1-6; id. 78.

[29] "COURT: All right. We're not going to talk about fraud. If you're not pursuing the fraud claim then we won't use the word

from offering evidence beyond two years back in time,[30] and from embarking on the overall background of these proceedings.[31] Nonetheless, this

---

fraud. Okay? IRAZU: No.", *Hearing before Judge Heller*, 7/11/2017, page 241; "IRAZU: -- a core issue for me -- in connection with the Stipulation. So I gave [a] significant amount of money, close to half a million dollars -- in my house in exchange to a very, very large extent, co-parenting -- That has not been the case and that's why I'm here --Considering this is null and void and actually fraud for other things.", *Hearing before Judge Heller*, 7/13/2017, page 16.

[30] "COURT: All right. Well, what I'm going to ask you to do is to -- really this is -- we're now in 2017, so I would like to tie it into events that are more current.", *Hearings before Judge Heller,* 7/11/2017, pages 64-65; "IRAZU: … I never ha[d] the opportunity to argue anything here, so suddenly I've [been] told no, you go back twelve months but they can go back ten years to argue abusive process. I don't see how my due process is protected and I don't see how I can make my case.", *Hearing before Judge Heller*, 7/11/2017, page 181; "COLLINS: -- this is not admissible evidence because it goes behind the last order of the court. COURT: Right. IRAZU: If I may – if I may, Your Honor? COURT: Just a minute, Mr. Irazu. The only reason, Attorney Collins, I'm going to allow Mr. Irazu to explain it a bit is I'm not certain that it's being offered as to payment issues. I think that it's being offered as to parenting issues. […] COLLINS: --tell me why he's offering evidence regarding payment. But obviously if it's something that was resolved in the 2016 stipulation, then it will not be admissible. Okay?", *Hearing before Judge Heller*, 7/13/2017, pages 56-57.

[31] "COURT: You can certainly testify about everything that's happened to you… IRAZU: And -- yes. And to conclude, he certainly has, as a former head of investment banking at JP Morgan for an entire region and division, a pretty good understanding of what can happen to a professional who is considered like a criminal. Mental[ly] insane, and an abuser. So -- which [are] the allegations that I've been dealing with since my divorce. And whether Mr. Collins is concerned about protecting certain groups, I have no intention of suing anybody. I could have already done so. COURT: Now, we're not talking

party contends there is sufficient relevant evidence on record to prove his case.[32] *Judge Heller* had offered herself to have this case resolved for the Respondent;[33] [34] disdained the opinion of the prior judge who ruled on the Stipulation of 6/10/2016 (*Tindill, J*);[35] provided comfort to the other party on the record in terms of not giving any weight to testimonial and documentary evidence admitted by her,[36] as well as what evidence marked for

---

about that. IRAZU: Okay.", *Hearing before Judge Heller,* 7/11/2017, pages 185-186.

[32] Almost 40 exhibits, including three sworn witness testimonies besides the parties, as well as all evidence, records and filings before the Appellate Court.

[33] "COURT: … As I told you, I'm not making any finding about contempt … It's going to be before the Court in April … Attorney Collins, is there anything, any questions -- COLLINS: No, Your Honor. I have no -- COURT: -- that Miss Oliva has or anything -- COLLINS: -- the ruling is clear. COURT: -- to be resolved? Okay. COLLINS: Thank you, Your Honor." *Hearing before Judge Heller*, 2/28/2017, page 94.

[34] Under the current Model Code of Judicial Conduct of the ABA, Rule 2.11 mandates recusal and/or disqualification: (i) *when a judge's impartiality might be reasonably questioned*; and (ii) *when the judge made prior statements committing her to a result in future legal proceedings.*

[35] "COURT: Well, what Judge Tindill said during some colloquy is not going to be relevant.", *Hearing before Judge Heller*, 7/13/2017, page 39, line 2.

[36] "COLLINS: And then we can, perhaps, see whether or not this court can do anything with regards to that [fraudulent and concealed divorce claim in Spain], which I doubt that it can. … COURT: All right. I'm going to allow the testimony. IRAZU: Thank you. COURT: And it may turn out that it has no substantial bearing, which of course goes to the weight of the evidence…But we've got ten minutes before lunch recess…", *Hearing before Judge Heller*, 7/11/2017, page 118; "COURT: … I think your comments go to the weight, not the admissibility -- COLLINS: Yes, Your Honor. … I do have a relevance objection. COURT: Yes. COLLINS: I assume that's being overruled on?

identification would be finally discarded with the participation of Attorney Kevin Collins;[37] and prejudged during a hearing arguing that enough evidence was available and that she wanted to hear a motion for order against the Petitioner to preclude him from seeking justice ever again and to sanction him.[38] As a result of a court-issued subpoena, insurance policy fraud was also uncovered –the Respondent had placed herself as the beneficiary of the $1,000,000 death benefit over this party's life via a revocable trust–,[39] among other misdeeds. A motion to open due to fraud was filed and argued to cover all formalities, if any.

The process to submit post-hearing briefs was unethically delayed for another half a year. The other party didn't argue a single defense to contempt or otherwise. The Respondent's "arguments", as construed by party counsel Attorney Kevin Collins, were limited to block the Petitioner from attaining justice and defamation, aiming at legal fees,

---

COURT: That's -- I think it -- that goes to the weight of -- COLLINS: Okay. COURT: And, yes, it is tangentially -- goes to the relevance but I'm going to allow those.", *Hearing before Judge Heller*, 7/11/2017, page 102.

[37] "COLLINS: Not the text [the one saying "*my attorney will take care of it*]. Email [about sports]. COURT: Not the text. Email. … All right. So the texts we're going to mark for identification and that'd be Defendant's Exhibit -- THE CLERK: J. COURT: --- J. And the mail will be K and is a full exhibit. COLLINS: And the court could see K. CLERK: No, no, no. The email's going to be I, Your Honor. COLLINS: Oh, I. COURT: The email's I. Okay. COLLINS: Then the court could see I. COURT: Okay.", *Hearing before Judge Heller*, 7/11/2017, pages 216-217.

[38] Id. 28.

[39] Exhibits P and O, *Hearings before Judge Heller*, 7/11-13/2017, id. 5.

sanctions, as well as a potential action for vexatious lawsuit upon a favorable ruling.[40] [41] [42] [43] [44]

---

[40] *Plaintiff's Motion for Order Post-Judgment* (abuse of process and "leave to file" protocol), 4/5/2017; *Plaintiff's Objections*, 8/8-10/2017; *Plaintiff's Post Hearing Reply Memorandum*, 11/3/2018; *Plaintiff-Appellee's Reply Briefs* (AC 41455/AC 41598, AC 42118); *Oral Argument of 1/22/2019,* AC 41455, AC 41598, AC 42118, Appellate Court.

[41] *Ex-Parte Application for Relief from Abuse,* 8/29/2018, Margarita Oliva Sainz de Aja, *Appendix to the Defendant-Appellant's Brief,* A 48-49, AC 42118, Appellate Court; "IRAZU: … So going back --- COURT: Any objection to this, Attorney Collins, as a court order? [#153, *Malone, J,* appointing Attorney Kevin Collins as trustee of $27,000 sequestered from the Petitioner, among others] COLLINS: Not really, Your Honor. But Your Honor has already taken judicial notice of the contents of the file [domestic abuse]. COURT: Right …", *Hearing before Judge Heller*, 7/11/2017, page 11.

[42] "COLLINS: … if one reads In Re Martin-Tragona, one case almost the repetitiveness of this; everybody is against me because of what I am. In In Re Martin-Tragona the basis was everything involved is Jewish; the judge is Jewish; the bankruptcy trustee is Jewish, the clerk is Jewish, the lawyers are Jewish … And now this is where we get to where we can't allow for any reason someone like Mr. Irazu to come in to this court and claim that somehow, Judge Heller is against him because he is a Caucasian male, a naturalized U.S. citizen pursuant to, quote unquote, extraordinary abilities under U.S. immigration laws. Born in Buenos Aires, Argentina, South American -- … COURT: I did -- I read it..", Representation of Attorney Kevin Collins, *Hearing before Judge Genuario*, 4/23/2018, page 44.

[43] "COLLINS: So the problem that we have is is that Mr. Irazu, from what I heard him say, is trying to connect up things that happened many years ago and wants to extrapolate from that information -- IRAZU: No. COLLINS: You know -- COURT: Right.", *Hearing before Judge Heller*, 7/11/2017, page 184, lines 19-25; id 40, 41, 42.

[44] Id. 40, 41, 42, 43; *Oral Argument of 1/22/2019,* AC 41455, AC 41598, AC 42118, Appellate Court.

**2018**. *Judge Heller's* rulings were issued on 3/2/2018 and 5/14/2018. She denied and/or ignored all relief sought by this *pro se* father. *Judge Heller* mirrored the requests from party counsel Attorney Kevin Collins, and argued that the Petitioner should be presumably sanctioned for filing a memorandum in excess of 35 pages with footnotes after him alerting the court in writing that such would be the case,[45] as well as an appendix composed of all relevant official transcripts;[46] for submitting selected evidence and records; and for formally requesting his due process to be respected as well as timely justice pertaining to children.

In her rulings, *Judge Heller* clarified that all court orders were clear and unambiguous and that the Respondent understood them;[47] incurred factual and procedural inaccuracies; deemed all of the violations to co-parenting duties by the Respondent mere *"communication challenges;"* recouped the Petitioner's testimony as to him not having spent one week of uninterrupted vacation with his children since 2009, including Christmas, but chose not to mention that the Respondent corroborated such misdeed under oath before her;[48] obviated any

---

[45] *Letter addressed to Honorable Donna Heller Judge,* 8/1/2017; id. 5.

[46] The Respondent's party counsel, Attorney Kevin Collins, pursued the strategy of senseless objecting. As a result, the Petitioner took the time to reconstruct all clear questions and answers in most relevant themes for the benefit of the lower courts.

[47] Margarita Oliva Sainz de Aja, *Hearing before Judge Tindill,* 6/10/2016, page 6.

[48] "IRAZU: So when was the last time I spent holidays with my children? … A: I remember, three, four years ago you took them skiing for a few days. … Over Christmas time. IRAZU: ---two

mention and relief as to the children not having seen and/or visited their grandmother for many years; ignored credible testimony from respectable witnesses confirming lack of co-parenting from the Respondent in various areas;[49] deemed the fraudulent and concealed divorce action in Spain implicitly legal, when the very same Spanish court declared it null and void, and registered the US divorce judgment through an *exequatur* as a result of this party's request; justified the Petitioner for feeling *"outraged"* as to the prior and highlighted the Respondent's *"intemperate and disrespectful"* sayings toward this party; ignored to mention insurance policy fraud, and an illegitimate lien against the Petitioner with negative professional consequences; disdained the partial nullity of the Stipulation of 6/10/2016; and decided not to grant any relief in terms of custody of the minor children, as well as equitable and financial adjustments, needless to say declare the Respondent in contempt to court for any violation of court orders.

The Petitioner scrutinized all transcripts and records, and following an objective standard, on 4/24/2018, he unsuccessfully pursued *Judge Heller's* disqualification as well as the transfer of any further proceedings to federal venue *(Genuario, J)*. After this party's motion for disqualification, *Judge Heller* called for *Family Services* to deal with this scenario for the fist time. The Petitioner claims biases and partiality

---

days? A: I -- I don't remember how many days. Q: Two days, when you went to Morocco and France on your own. COURT: Okay. Let's --- A: Yes. COURT: ---talk about – what's happening now. Okay..", Margarita Oliva Sainz de Aja, *Hearing before Judge Heller*, 1/16/2018, page 39.

[49] Julio Ojea Quintana, *Hearing before Judge Heller*, 7/11/2017, pages 88-89, 109.

have been objectively proven by clear and convincing evidence.[50]

Last 9/12/2018, the Respondent obtained a nationwide restraining order against the Petitioner from the district court *(Truglia, J)*.

**2019-Present Time**. Since 7/2016, the Petitioner has seen his oldest daughter on a few occasions for a few hours each, and has virtually lost contact with his youngest daughter, who is undergoing serious issues impacting her wellbeing.

The Petitioner's mother, the only living grandparent of the children and the one who took good care of them when they were little, could not see them for eight years. On record, the Respondent's counsel, Attorney Kevin Collins, told the district court the Petitioner *"can Google grandparents rights."* [51] [52]

Despite the Petitioner's claims are not moot, in tandem with the opinion of the Court, it is a fact of reality no court order can bring back the time lost in the lives of the Petitioner,[53] his children, and close extended family, but remedies can serve the purpose of rendering true justice.[54] This abusive litigation extends to more than ten years; almost four years

---

[50] Id. 28-39, 42-43, 45-49, 55; Appendix C.

[51] Transcripts, Representation of Attorney Kevin Collins, *Hearing before Judge Heller,* 7/13/2017, pages 48, 71-72.

[52] *In re, Troxel v. Granville,* 530, U.S. 57 (2000).

[53] "… courts can and should take steps to decide these cases as expeditiously as possible, for the sake of the children …", *in re, Chafin v. Chafin,* 133 S. Ct. 1017, 185 (2013).

[54] "…U.S. courts continue to have personal jurisdiction over Ms. Chafin, may command her to take action even outside the United States, and may back up any such command with sanctions…", *in re, Chafin v. Chafin,* 133 S. Ct. 1017, 185 (2013).

since the Respondent filed her vexatious and abusive action last 12/2015; and almost three years since her fraudulent and concealed divorce process in Spain last 6/2016.[55] The Petitioner's life has been consumed by litigation in both the United States and Europe, to the point of losing his employment.

## REASONS FOR GRANTING THE PETITION

**1. US Public Policy Issue of Exceptional Importance: International Private Law and Foreign *Exequatur* Proceedings; Protection and Enforcement of US Jurisdiction, Laws and Final Judgments; Conflict with Precedent of the Court Per *Chafin v. Chafin*.[56]**

In the case under analysis there is a final US divorce judgment and orders to be obeyed, which should have been respected and registered by the Respondent through an *exequatur* in Spain –never in competition with a simultaneous and/or contiguous foreign divorce process.

The *exequatur* is the procedural codified institution under Continental Law that allows a peaceful legal coexistent among sovereign nations

---

[55] "IRAZU: --- the reason why I'm arguing this, Your Honor, is because there are new developments in a situation that has no relief and no resolution. And the delays and extensions within the court system by the other party are clearly designed to perpetrate an illegal frame in which my parental rights are completely destroyed, to put it somehow in violation of *Chafin*, which is a court – Supreme Court decision, fairly recent. As you might remember, the other party attempted to subject the children to a foreign jurisdiction, similar to that frame, clearly under *Troxel* as well –", *Hearing before Judge Heller*, 1/16/2018, page 6, lines 13-24.

[56] *In re, Chafin v. Chafin,* 133 U.S. 1017, 185 (2013).

worldwide by recognizing and enforcing final foreign judgments at the pertinent domestic level. As a sophisticated attorney qualified in the US and Spain,[57] the Respondent acknowledged under oath knowing the concept and purpose of an *exequatur* under Continental Law.[58]

The US divorce judgment and orders were directly attacked when the Respondent in a premeditated fashion[59] subsequently activated Spanish jurisdiction and laws over three minor children and the parties through a concealed and fraudulent divorce action –as opposed to filing for such *exequatur*–, also in the pursuit of undue financial benefit.[60] If the Spanish divorce process would have come to an end without an *exequatur* of the final US divorce judgment –granted as a result of this party's request–, thus issuing a new divorce judgment under Spanish jurisdiction and laws, the US judgment and orders would have not been

---

[57] Id. 17.

[58] Q: Are you telling me and the Court that you don't know what an *exequatur* is? A: No, I haven't told you that that I don't know what an *exequatur* is. Q: You do know? A: I know what an *exequatur* is, yes. Q: You do know? A: Yes. Q: Okay. So you know that an *exequatur* is [an] enforcement of [a] foreign final judgment in a different jurisdiction? You know that? A: I do, yes.", Margarita Oliva Sainz de Aja, *Hearing before Judge Heller*, 7/11/2017, pages 144, lines 25-27; 145, 1-9.

[59] Id. 58; "IRAZU: There is a major issue in terms of conflict of laws that has been thoroughly considered throughout this process. My wife rejected to repeal Spanish law and because of the mistake in Mrs. Ramer's pleadings as to our marriage date [10/18/1995 as opposed to 10/6/1995] that continued throughout the process, I decided to counterclaim for dissolution…", Fernando Irazu, *Divorce Trial before late Judge Harrigan*, 6/10/2010, pages 92-93.

[60] Id. 20.

enforceable in Spain.[61] All in all, irrespective of such foreign jurisdiction having been activated by the Respondent with false marriage data, domiciles, residences and documentation.[62]

A new divorce process under Spanish jurisdiction was not only unnecessary but also illegitimate under Spanish and US laws. If the Respondent's objective was to be divorced from the Petitioner with legal effect in Spain, an *exequatur* could have been pursued by her under Spanish law as long as she cannot divorce someone from whom she is no longer married to, as the very same Spanish district court affirmed at the time of declaring the nullity of her illegal divorce action and subsequently accepting this party's *exequatur*.[63]

Ultimately, the Spanish court protected and enforced US jurisdiction, laws and the final divorce judgment of the parties, something the lower courts in Connecticut refused to do within an overall case questioning the performance of a local judge and forum. The legal message sent from Connecticut to the entire world is that US jurisdiction, laws and judgments can be challenged abroad, even via fraud, concealment and deceit in the pursuit of improper benefits, not only without consequences back home but in fact rewards and potential sanctions against the party making this very same claim after protecting such US jurisdiction, laws and judgments

---

[61] An *exequatur* is not possible if there is a prior or subsequent final judgment (art. 52.1 of Law 29/2015; arts. 81, 86, 89, 97 and ss., Civil Code; art. 96 and ss, Civil Registry Law; arts. 22, 323.2, 144, and ss., Law of Civil Proceedings).

[62] Id. 20.

[63] Id. 25.

in foreign lands.

    The rulings under review represent a substantive matter of law and public policy against the unanimous precedent of the Court set per *Chafin v. Chafin*,[64] federal and international legislation regarding minor children like the Uniform Child Custody Jurisdiction and Enforcement Act, the Parental Kidnapping Prevention Act, and the Hague Convention on the Civil Aspects of International Child Abduction, among others,[65] as well as comity principles under local law.[66] Although this is a family law case and not moot, the larger topic herein is of utmost importance under US public policy, including the enforcement of US final judgments against foreign governments, institutions and/or companies abroad.[67]

---

[64] Id. 56.

[65] Parental Kidnapping Prevention Act, 28 U.S.C., 1738 A (b) and (f); Uniform Child Custody Jurisdiction and Enforcement Act, Chapter 1, § 102-105, Chapter 2, § 201; Hague Convention on the Civil Aspects of International Child Abduction, Articles 2-5; US Department of State, US Customs and Border Protection Guidelines; Preface and Provisions 1, 2, 3, 5, 7, Memorandum of Decision, 9/2/2010; Provision 6, Stipulation, 6/10/2016, Appendices D and F.

[66] *In re, Cashman v. Cashman*, 41 Conn. App. 382, 676 A.2d 427 (1996); *Zitkene v. Zitkus*, 140 Conn. App. 856, 60 A. 3d 322 (2015); *Lindo v. Lindo*, 48 Conn. App 645, 710 A.2d 1387 (1998); *Van Wagner v. Van Wagner*, 1 Conn. App 578, 474 A.2d 110 (1984); *Burton v. Burton*, 189 Conn. 129, 454 A.2d 1282 (1983); *Morabito v. Wachsman*, 191 Conn. 92, 463 A.2d 593 (1983).

[67] "…Courts also decide cases against foreign nations, whose choices to respect final rulings are not guaranteed […] … "[H]owever small" that concrete interest may be due to potential difficulties in enforcement, it is not simply a matter of academic debate, and is enough to save this case from mootness. (internal citations omitted)," *in re, Chafin v. Chafin*, 133 U.S. 1017, 185 (2013).

## 2. Fundamental Rights and Strict Scrutiny: *de facto* Termination of Parental Rights, Property Rights, Lack of Due Process, and Unequal Treatment Under the Law.

Against the best interest of children, the practical outcome of the ruling under review has been the *de facto* termination of the Petitioner's parental rights through an uninterrupted *status quo* of contempt to court and fraud by the Respondent –never per Connecticut General Statutes, § 45a-717, the normative step to accomplish such a goal–,[68] which carries serious violations of this party's due process as a result of his unequal treatment under the law. [69]

As recounted, the Petitioner was denied of timely justice and precluded from offering relevant evidence to further substantiate his claims before the district court, and all evidence before the local courts was also ignored against minimal principles of due process, therefore impacting the Petitioner's fundamental rights.[70] Parental rights are among the greatest any person might hold, thus demanding heightened protection when not strict scrutiny upon their

---

[68] Connecticut General Statutes, § 45a-717, (a) through (k). *Termination of Parental Rights. Conduct of Hearing. Investigation and report. Grounds for Termination.*

[69] *In re, Santosky v. Kramer*, 455 U.S. 745 (1982); *Meyer* v. *Nebraska,* 262 U.S. 390, 399, 401 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 535 (1925); *Armstrong v. Manzo,* 380 U.S. 545 (1965); *Stanley v. Illinois,* 405, U.S. 645, 651 (1972); *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972); *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978); *Parham v. J. R.,* 442, U.S 584, 602 (1979); *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997); *Troxel v. Granville,* 530 U.S. 57 (2000).

[70] *In re, Troxel v. Granville*, 530 U.S. 57 (2000).

infringement.[71]

Over the years the Court has leveled the field in terms of recognizing women deserve a fair access to and/or treatment at the workforce, even within traditionally male dominated areas like military academies.[72] By the same token, the Court has also acknowledged that fathers cannot be treated in a different fashion[73] in multiple areas of family law,[74] needless to say when we are talking of a loving, outstanding and committed father like in the present case. Depriving a father of his parental relationship and time by unilaterally sending a minor child for college to a foreign country, among many other actions and omissions against due co-parenting, is not only a violation to court orders as well as federal and international normative related to children,[75] but in principle a constitutional infringement on his parental rights.

Post-divorce, the only legal bonding to be respected and protected, as far as the parties are concerned, is the one linking parent and child upon truthful co-parenting. The Court has proclaimed that a parent's right to *"the companionship, care, custody*

---

[71] "…I would apply strict scrutiny to infringements of fundamental rights.", (Thomas, J., concurring).", *in re, Troxel v. Granville*, 530 U.S. 57 (2000).

[72] *In re, Stanton v. Stanton* (no social stereotypes as legitimate basis), 421 U.S. 7, 10 (1975); *United States v. Virginia* (equal access to women)*, 518 U.S. 515 (1996).

[73] *In re, Caban v. Mohammed* (no distinction between unmarried mothers and unmarried fathers), 441 U.S. 380 (1979).

[74] *In re, Stanley v. Illinois* (unwed fathers hold equal rights), 405 U.S. 645 (1972); *Quilloin v. Walcott* (better divorced-father to be treated equally), 434 U.S. 246 (1978).

[75] Id. 65.

*and management of his or her children"* is an interest *"far more precious"* than any property rights,[76] which have nonetheless been severely impacted by the proceedings under scrutiny. The ruling under review represents a substantive matter of law in conflict with settled precedents from the Court.[77] [78]

### 3. Disqualification of *Judge Heller* and Transfer to Federal Venue: Prejudgment and Unequal Treatment.

The Petitioner proved through objective records the unequal treatment he was subject to by the lower court after filing and arguing a proper motion to disqualify[79] and transfer any further proceedings to federal venue.[80] A fair trial was not an ingredient of the rulings under review, impacting their constitutional validity,[81] as long as justice is not an issue of venue, popularity, vocal performance and/or perceptions in certain hearing, rather what is due to someone in particular based on the facts of the case, applicable law, and evidence. This has not been the case in these proceedings marked by *"an evil eye and an unequal hand",*[82] and, therefore, the absence of the

---

[76] *In re, May v. Anderson*, 345 U.S. 528 (1952).

[77] Id. 69-74, 76, 78, 81-82.

[78] *In re, Byars v. U.S.* (constitutional violations via circuitous and indirect methods), 273 US 28 (1927).

[79] *In re, Gillis v. Gillis*, 214 Conn. 336, 343, 572 A.2d 323 (1990).

[80] *In re, Adams v. Adams,* 93 Conn. App. 423, 426, 890 A.2d 575 (2006).

[81] *In re, Murchison*, 349 U.S. 133, 136 (1950); *Caperton v. A.T. Massey Coal* Co, 129 S. Ct. 2252, 2259 (2009); *Cameron v. Cameron,* 187 Conn. 163, 170, 444 A.2d 915 (1982); *State v. Stanley*, 161 Conn. App. 10, 32, 125 A. 3d 1078 (2015); *Hawley v. Baldwin*, 19 Conn. 585, 590 (1849).

[82] *In re, Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

rule of law.

*Judge Heller*, a resident of Greenwich, Connecticut, should have recused and/or disqualified herself,[83] and the Appellate Court ruled on the matter without addressing her performance or any of the issues at hand. Retaliation for pursuing justice[84] is not sheltered in the United States,[85] and the ruling under review obviates and is in conflict with standards set by the Court as well as local and federal precedents.[86]

The lower courts even ignored their own law as to the concept of bad faith and fraud, contempt to court, standards applicable to a *pro se* father when the wellbeing of his children is at stake, as well as suitable equitable and legal remedies in family proceedings.[87]

Furthermore, the Appellate Court's discretion has been used to conceal and affirm injustice rather than to bring light to relevant outstanding issues and

---

[83] Connecticut Practice Book, *Code of Judicial Conduct*, Canon 2. Rule 2.2; Rule 2.3. Rule 2.11.

[84] *In re, United States v. Brown,* 72 F.3d 25, 29 (5th Cir. 1995); *McKenna v. Delente*, 123 Conn. App. 137, 144–45, 1 A.3d 260 (2010).

[85] *In re, Jenkins v. McKeithen*, 395 U.S. 411 (1969); *Hannah v. Larche,* 363 U.S. 420 *(*1960).

[86] Id. 81, 84-85.

[87] *In re, Mulholland v. Mulholland*, 229 Conn. 643, 649, 643 A.2d 246, 249 (1994); *Kasowitz v. Kasowitz,* 140 Conn. App. 507, 59 A.3d. 347 (2013); *Landry v, Spitz*, 102 Conn. App. 34, 42-43 (2007); *Billington v. Billington*, 220 Conn. 212, 217-18, 595 A.2d 1377 (1991); *Reville v. Reville*, 312 Conn. 428, 442, 93 A3d 1076 (2014); *Cimino v. Cimino*, 174 Conn. App. 1, 9-10 (2017); *Oneglia v. Oneglia,* 14 Conn. App. 267, 271-272, 540 A.2d 713 (1988).

advance justice.[88]  The Appellate Court requested *sua sponte* for Attorney Kevin Collins, the Respondent's counsel, to answer motions or requests filed by the Petitioner and to submit a brief out of the statutory period; denied this party the standard additional pages to address constitutional concerns; consolidated *sua sponte* the case related to the disqualification of *Judge Heller* only to deny this party the opportunity to submit a separate brief on it; and denied the Petitioner's request for relief prior to oral arguments, among others. The interpretation of the law and rules has been one-sided.[89]

The Petitioner's opinions are rooted in objective matters of fact and law, thus respectfully falling within acceptable standards[90] insofar they give rise to an objective, reasonable belief that the assertions are true, which are protected speech at the federal level.[91] The Petitioner claims biases and partiality subject to strict scrutiny, never financial corruption or otherwise.[92]

---

[88] Connecticut Practice Book, *Rules of Appellate Procedure*, § 60-1.

[89] *Orders of the Appellate Court*, 4/11-12/2018, 5/2/2018, 8/29/2018, 10/11/2018, 12/27/2018, 1/3/2019, 1/9/2019, 1/22/2019, AC 41455, AC 41598, AC 42118; id. 88.

[90] *In re, Burton v. Mottolese*, 267 Conn. 1, 51 (2003).

[91] *In re, United States District Court v. Sandlin*, 12 F.3d 861 (9th Circuit 1993); *Standing Committee on Discipline of U.S. District Court for Central District of California v. Yagman*, 55 F 3d. 1430 (CA 9, 1995).

[92] *In re, Statewide Grievance Committee v. Burton,* 299 Conn. 405 (2011).

### 4. Curtailment of Parental and Property Rights Through Abusive Pattern within the Legal System: Nationwide Civil Restraining Order and Constitutional Violations.

As proven, the Respondent engaged in a pattern of advancing civil claims[93] via illegal and/or illegitimate means.[94] Relevant evidence includes correspondence with the Greenwich Police Department and the local judiciary, photographs of the Petitioner's bruised body post his illegal arrest, sworn witness testimonies of various parties –also from the Respondent herself–, official correspondence from the Respondent to the court, neuropsychological studies of the Petitioner, financial affidavits and records, threats of all sorts against the Petitioner by the Respondent, documentation contradicting the respective police reports, among others. This reproachable pattern is extensive to the past joint efforts of the Greenwich Police Department and the Respondent in trying to arrest the Petitioner for non-existent violations to some prior spurious protective order.[95]

With pending oral arguments at the Appellate Court, last 9/12/2018 the Respondent obtained a nationwide one-year civil restraining order from the district court under penalty of federal punishment. The Petitioner has no intimate relationship with the Respondent, and despite he does not own or possess any firearms he is now precluded from doing so.[96]

---

[93] Transcripts, *Hearing before Judge Truglia*, 9/12/2018, pages 13-19, 23.
[94] Id. 8, 93, 113.
[95] Id. 94.
[96] Appendix C.

The parties have been living apart for ten years and the Petitioner has lived in New York City for more than two years without any incidents and meaningful interaction.

The effect of this restraining order is to reinforce a *status quo* of contempt to court regarding lack of co-parenting and fraud, as a result of placing the Petitioner at risk of criminal charges and prosecution in his interaction with the other party, under the same legal standards that allowed such order to be granted in the first place.[97]

No behavior from the Petitioner fell under Connecticut General Statutes § 46b-15[98] to vouch for such an order, something corroborated by local[99] and out-of-state precedents –including some with laxer standards–,[100] which in various cases grant

---

[97] "COURT: Okay. Now, sir, you don't' have to fear the police as long as you abide by this order. By if you do violate the order, I'm advising you it is a class – potentially a class D felony. IRAZU: That's my fear. COURT: I know. So it's very simple. Don't contact her. IRAZU: But I have to [co-parenting]. If I'm -- if she contacts me…", *Hearing before Judge Truglia*, 9/12/2018, pages 28, lines 26-27; 29, lines 1-7.

[98] Connecticut General Statutes § 46b-15(a). *Relief from Physical Abuse, Stalking or Pattern of Threatening by Family or Household Member.*

[99] *In re, Putnam v. Kennedy* (no subjective feelings as statutory grounds), 104 Conn. App. 26, 34, 932 A.2d 434 (2007); *Jordan M. v. Darric M.* (continuous threat of present physical injury required), 168 Conn. App. 314, 319, 146 A.3d 1041 (2016); *Rosemarie B-F. v. Curtis P.* (one incident as insufficient grounds), 133 Conn. App. 472, 477, 38 A.3d 138 (2012).

[100] *In re, Marriage of Evilsuzor v. Sweeney* (abusive speech), 237 Cal. App. 4th 1215 (2015); *Hogue v. Hogue* (cyber abuse)*,* 16 Cal. App. 5th 833 (2017); *Nevarez v. Tonna* (past proven behavior), 227 Cal. App. 4th 774 (2014); *Burquet v. Brumbaugh* (disturbing the peace), 223 Cal. App. 4th 1140 (2014).

30

reciprocity per comity principles under federal normative.[101] [102] Transcripts prove the requirements to grant this restraining order relied on falsehoods.[103] Subjective feelings are not typified as valid grounds to issue protective orders because they might not be truthful, in sync with reality, and/or have any correlation or proportionality with the objective conduct of the other party.

Unsuccessfully, last 8/2018 the Respondent attempted to generate inflammatory written exchanges that could facilitate her obtaining an order of this sort. However, she was still able to manipulate a harmless single written communication from the Petitioner, longing for peaceful justice in the legal system within the context of praying for eternal justice at a Christian gathering in church –in fact, protected speech between the parties according to their own shared religious beliefs.[104] The Spanish written words *"injustices are paid"* were deemed by the district court as an implied threat, not even the "pattern of threats" capable of putting a person's life at risk of immediate physical harm, as required per

---

[101] 18 U.S. Code § 2265. *Full Faith and Credit Given to Protection Orders*; 18 U.S. Code § 2262. *Interstate Violation of Protection order*; 18 U.S. Code § 922 (g) 8. *Unlawful Acts;* among others.

[102] *In re, United States v. Morrison*, 529 U.S. 598 (2000).

[103] "IRAZU:…[it's been] already proven before the Court that I'm a sane man, that I'm a nonviolent, peaceful man, that I pose no threat to anybody, and that I haven't threatened anybody. So in order to say that someone has threatened, there has to be something concrete.", *Hearing before Judge Truglia*, 9/12/2018, page 26.

[104] Transcripts, *Hearing before Judge Truglia*, 9/12/2018 pages 24-25; id. 11.

local law.[105]

The order from the district court further detached the Petitioner from his children, also preventing any potential inspection of his partially owned home. The Petitioner is not allowed to pick up or drop his children at their place of residence, and he cannot be present in school and religious events, medical emergencies and appointments, and/or any other occasion if the Respondent happens to be there without the joint company of both children residing with her.[106] As a principle, it is never a moot issue.[107]

This order was granted in violation of the Petitioner's due process, and perpetuates an unequal treatment of this party under the law. In this sense, the Court has set a balanced test mandating minimal basic requirements of due process to be respected at the time of issuing a restraining order via a proper hearing,[108] and those requirements are not met for the simple fact of holding it. Conducting a hearing before a judge, as if there were no hearing and no judge, is nothing short of utilizing a restraining order as a sword instead of a most needed shield.[109]

The Petitioner was not allowed to introduce any evidence or even to question the Respondent under

---

[105] Transcripts, *Hearing before Judge Truglia*, 9/12/2018, pages 7, 13, 16, 25, 26, 28, 30.

[106] Id. 96.

[107] *In re, Putnam v. Kennedy*, 279 Conn. 162, 900 A.2d 1256 (2006).

[108] *In re, Matthews v. Eldridge,* 424 U.S. 319 (1976).

[109] *In re, Connecticut v. Doehr* (unconstitutional statute for no hearing in prejudgment attachment of property), 501 U.S. 1 (1991).

oath;[110] he was precluded from actually reviewing the spurious evidence admitted by the district court;[111] and the officiating magistrate refused to scrutinize and take judicial notice of all records proving defamation, falsehoods and ulterior goals in the midst of family proceedings before the Appellate Court.[112] The district court judge ruled from the bench without any emergency at hand –an *ex parte* application had been denied two weeks prior–, after addressing presumable concerns related to Greenwich's First Selectman and the proximity of their residences –less than 100 yards apart from the Respondent–, as well as the illegalities endured by this party in such location.[113]

The Court held the police are not liable for not enforcing the terms of a restraining order that culminated in a violent crime,[114] and federal precedents also exempted the police from liability for not providing around the clock protection to a white family who was harassed by a gang of motorcyclists, a situation that prompted those victims to move out of their home and town –irrespective of discrimination

---

[110] *In re, Haines v. Kerner*, 404 U.S. 519 (1972).

[111] Id. 105.

[112] *In re, Boddie v. Connecticut* (due process as meaningful opportunity to be heard), 401 U.S. 371 (1971).

[113] Transcripts, *Hearing before Judge Truglia*, 9/12/2018, pages 27-28; *Miranda v. Arizona,* 384 U.S. 436 (1966); *Graham v. Connor,* 490 U.S. 386 (1989); *Malley v. Briggs,* 475 U.S. 335 (1986); *Cuyler v. Sullivan* 446 U.S. 335 (1980); "...[A] kind of society that is obnoxious to free men shall never be encouraged.", *in re, Burdeau v. McDowell,* 256 U.S. 465 (1921); *Walder v. Unites States,* 347 U.S. 62 (1954); *Klopfer v. North Carolina*, 386 U.S. 213 (1967).

[114] *In re, Castle Rock v. Gonzales (contrario sensu)*, 545 U.S. 748 (2005).

against this white family was entertained by the federal court of appeals.[115]

In this case, the facts of those precedents operate in an inverse fashion as long as a father was "singled-out" in preparation for and in the midst of long-lasting family proceedings under the premise of protecting a false victim. The Petitioner was proved innocent of those defamatory allegations, but as a US citizen he was nonetheless harassed, persecuted, as well as compelled to relocation and "self-deportation" to his country of origin.[116] It is fair to claim the Petitioner endured an inappropriate "hostile" public-related conduct[117] for a variety of identifiable reasons, which also seem to include his religious and otherwise beliefs.[118] The pretext of crime prevention cannot condone criminal activity from third parties and public retaliation for alleging so.[119]

---

[115] *In re, Del Marcelle v. Brown County Corp. (contrario sensu),* 680 F.3d 887 (7th Cir. 2012).

[116] *In re, Ng Fung Ho v. White*, 259 U.S. 276 (1922); *Sessions v. Dimaya*, 584 U.S. (2018).

[117] *In re, Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. (2018).

[118] Id. 11, 48, 78, 81-84, 117, 119; *Defendant's Petition for Clarifications*, 9/7/2010.

[119] *In re, Timbs v. Indiana* (unconstitutional public behavior regarding property rights), 586 U.S. (2019).

34

## CONCLUSION

The Petitioner pleads the Court to admit this *Petition for Writ of Certiorari* in light of his rights per the First, Fourth, Fifth, Sixth, Eight, Ninth, and Fourteenth Amendments of the US Constitution.

DATED at New York, NY, April 15, 2019.

Fernando G. IRAZU *Pro Se*
Petitioner
34 Boulder Brook Rd.
Greenwich, CT 06830-3514
fgirazu@gmail.com

i.

# INDEX TO APPENDICES

APPENDIX A: Supreme Court of the State of Connecticut Order on Petition for Certification, 3/13/2019 (PSC 18-0347)……….…………….………..A-1

APPENDIX B: Appellate Court of the State of Connecticut, State of Connecticut, 2/12/2019 (187 Conn. App. 902) (AC 41455, *Heller, J;* AC 41598, *Genuario, J;* and AC 42118, *Truglia,J*)…................A-2

APPENDIX C: Superior District Court of Stamford/Norwalk, Connecticut, 3/2/2018 and 5/14/2018, *Heller J;* 4/24/2018, *Genuario, J;* 9/12/2018, *Truglia, J*)………………………….…….………....A-3

APPENDIX D: Superior District Court of Stamford / Norwalk, Connecticut, Stipulation, 6/10/2016 *(Tindill, J)*…….……………………………………….……A-23

APPENDIX E: Superior Disctrict Court of Stamford / Norwalk, Connecticut, Order Re. Mot # 153, 11/22/2010 *(Malone, J)*….……………………..…..A-27

APPENDIX F: Superior District Court of Stamford / Norwalk, Connecticut, Memorandum of Decision, 9/2/2010 (*Harrigan, J,* incorporating Orders of Marital Dissolution*, Malone, J*)………….…..…..A-30

A-1

## APPENDIX A

## SUPREME COURT
## STATE OF CONNECTICUT

PSC-18-0347
MARGARITA O.
v. FERNANDO GABRIEL IRAZU

## <u>ORDER ON PETITION FOR</u>
## <u>CERTIFICATION TO APPEAL</u>

The defendant's petition for certification to appeal
from the Appellate Court, 187 Conn. App. 902 (AC
41455), is denied.
*Fernando G. Irazu*, self-represented, in support of the
petition.

Decided March 13, 2019.

By the Court,

<u>/s/ Cory M. Daige</u>
Assistant Clerk – Appellate

Notice Sent: March 13, 2019
Petition Filed: February 13, 2019
Clerk, Superior Court, FST-FA09-4017497-S
Hon. Donna N. Heller
Clerk, Appellate Court
Reporter of Judicial Decisions
Staff Attorneys' Office
Counsel of Record

A-2

## APPENDIX B

## APPELLATE COURT
## STATE OF CONNECTICUT

MARGARITA O. v. FERNANDO G. IRAZU
(AC 41455)
Lavine, Alvord and Elgo, Js.

Argued January 22—officially released February 12, 2019

Defendant's appeal from the Superior Court in the judicial district of Stamford-Norwalk, *Heller, J.; Genuario, J.; Truglia, J.*[120]

Per Curiam. The judgments are affirmed.

---

[120] Post-denial of the Petition for Certification by the Supreme Court of the State of Connecticut, the Appellate Court reversed its decision as to AC 42118 *(Truglia, J),* and this case is pending of resolution.

A-3

### APPENDIX C

| | | |
|---|---|---|
| DNo: FST-FA-09-4017497S | : | SUPERIOR COURT |
| MARGARITA OLIVA SAINZ DE AJA | : | JUDICIAL DISTRICT OF |
| | | STAMFORD/NORWALK |
| v. | : | AT STAMFORD |
| FERNANDO GABRIEL IRAZU | : | MARCH 12, 2018 |

### MEMORANDUM OF DECISION ON MOTION FOR CONTEMTP, POST-JUDGMENT

The Plaintiff Margarita Oliva Sainz de Aja and the defendant Fernando Gabriel Irazu were divorced on September 2, 2010 (the September 2010 dissolution judgment) *(Harrigan, J.)* (#149.55; #150.00). On June 10, 2016, the plaintiff and the defendant entered into a stipulation (the June 2016 stipulation) (#210.000 that modified certain terms of the September 2010 dissolution judgment. The stipulation was approved and so ordered by the court *(Tindill, J.)* that day. On June 19, 2017, the defendant filed a motion for contempt, post-judgment (#231.00), in which he sought an order holding the plainitff in contempt for violation of the September 2010 dissolution judgment and the June 2016 stipulation.

The parties were before the court on July 11, 2017 and July 13, 2017. The plaintiff was represented by counsel and the defendant represented himself. The court heard testimony from five witnesses, including

the parties, reviewed the exhibits that were admitted into evidence, took judicial notice of the court file, and reserved decision at the time. Certain of the exhibits offered by the defendant were in Spanish. The court gave the defendant the opportunity to submit English-language translations of the exhibits that were in Spanish following the hearing. The defendant submitted certified translations to the court on August 1, 2017. The court opened the record to include the certified translations at that time.

The court set a briefing schedule for the parties to file their respective memoranda at the conclusion of the hearing. The defendant filed a seventy-page memorandum on August 7, 2017, in violation of Practice Book § 4-6(a), together with a 255-page appendix. On August 8, 2017, the plaintiff filed an objection and a motion to strike the defendant's post-hearing memorandum, post-judgment (#238.00). The defendant filed a pleading styled, "Answer to 'Plaintiff's Objection to and Motion to Strike Defendant's Post-hearing Brief, Post-Judgment", as well as 'Grievance Complaint Against Attorney Kevin Collins'" on August 9, 2017 (#239). The plaintiff filed a reply and objection to the defendant's answer to the plaintiff's objection and motion to strike on August 10, 2017 (#240.00). The defendant responded with a reply/objection to the plaintiff's motion to strike/objection on August 14, 2017 (#241.00). The defendant filed an amended request for relief (#242.00) the same day, together with a post-hearing memorandum that was thirty-five pages long, with thirty-four pages of annotations and footnotes, and a 254-page appendix (#243).

A-5

Counsel for the plaintiff and the defendant were before the court on August 28, 2017. The court ordered the defendant to file a post-hearing memorandum that complied with Practice Book § 4-6(a) or seek leave of the court to file a memorandum that exceeded the page limit by September 11, 2017. The defendant filed a motion regarding his post-hearing brief on August 28, 2017 (#244.00).

On September 18, 2017, counsel for the plaintiff and the defendant were again before the court. The court heard argument at that time concerning the lenght of the defendant's post-hearing memornadum. The defendant filed a request for judgment to be entered in his favor that day (#245; #246).

The defendant filed a motion to open judgment on October 5, 2017 (#247.00), in which he seeks to open the June 2016 stipulation and obtain substantially similar relief as to that which he seeks in the motion for contempt, post-judgment, that is before the court.

On October 10, 2017, the defendant filed a notice of compliance with the court order and a revised post-hearing memorandum (#248). The memoranudm is thrity-five pages long.[1]

The plaintiff filed a memorandum in opposition on November 3, 2017 (#250.00). The defendant filed a reply memorandum on November 6, 2017 (#250.00), which amended requests for relief (#251.00). To the extent that they are material to the issues before the

---

[1] There are 338 footnotes reflected in the memorandum, but the text of the footnotes was not included.

court and in compliance with the requirements of the Practice Book, the court has considered the arguments set forth in the parties' post-hearing memoranda in making the findings and issuing the orders that are set forth below.

On November 27, 2017, counsel for the plaintiff and the defendant were before the court on the defendant's motion to open judgment (#247.00). According to the defendant, his motion to open related back to the hearing held on July 11, 2017 and July 13, 2017. The defendant contended that he had introduced sufficient evidence at the hearing to satisfy the requirements of *Oneglia v. Oneglia*, 14 Conn. App. 267, 540 A.2d 713 (1988), so that the court should open the June 2016 stipulation and grant the relief sought in the motion for contempt, post-judgment that is addressed in the memorandum of decision. The court did not agree and marked the motion off.

Since the conclusion of the post-hearing briefing, the defendant has submitted additional pleadings and memoranda, including copies of pleadings filed in other matters, that have no relevance to the issues before the court. The court has not considered these documents in preparing this memorandum.

I

The gravamen of the defendant's motion for contempt, post-judgment is that the plaintiff has refused to engage in co-parenting of the parties' three children in accordance with the September 2010 dissolution judgment and paragraph 6 of the June 2016 stipulation. The defendant also contends that the plaintiff is in contempt of court for commencing a

proceeding in Spain to obtain a Spanish divorce following the entry of the June 2010 dissolution judgment.

"Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense." (Citation omitted; internal quotation marks omitted). *Wilson v. Cohen*, 222 Conn. 591, 596 n.5 610 A.2d 1177 (1992). "Civil contempt is committed when a person violates an order of court which requires that person in *specific and definitive language* to do or refrain from doing an act or series of acts … Whether an order is sufficiently clear and unambiguous is a necessary prerequisite for a finding of contempt…" (Emphasis in original; citations omitted; internal quotations marks omitted.) *In re Leah S.*, 284 Conn. 685, 695, 935 A.2d 1021 (2007). "In a civil contempt proceeding, the movant has the burden of establishing ... the existence of a court order and noncompliance with that order…" (Citation omitted; internal quotation marks omitted.) *Mashall v. Marshall*, 151 Conn. App, 638m 651, 97 A.3d 1 (2014). Indirect civil contempt, as is alleged here, must be proven by clear and convincing evidence. *Brody v. Brody*, 315 Conn. 300, 316, 105 A.3d 887 (2015). "To constitute contempt, a party's conduct must be wilful … Noncompliance alone will not support a judgment of contempt." (Citations omitted; internal quotation marks omitted.) *Oldani v. Oldani,* 132 Conn. App. 609, 625-26, 34 A.3d 407 (2011), abrogated in part on other grounds by *Brody v. Brody*, supra, 315 Conn. at 316.

The court will begin with the defendant's claim that the plaintiff has violated the September 2010

dissolution judgment and paragraph 6 of the June 2016 stipulation by failing to engage in co-parenting. The September 2010 dissolution judgment ordered that the parties would have joint legal custody of the minor children, and it reflects the parties' intention "to mutually and flexibly cooperate and co-parent the children keeping the children's best interests as their primary concern." Paragraph 6 of the June 6 stipulation provides that "[as] of the date hereof, the Defendant represents that he relies upon Plaintiff's representation regarding the tenets of co-parenting and that both parties will fully abide by said standards going forward, in particular each party shall provide with prior written travel notifications of the children and prior conferring on selection of tutors, sports and recreational camps, as well as college application process and in situ visits. Neither party shall require the consent of the other to travel with the children. Within the context of those duties, the Plaintiff will allow the Defendant access to any and all information related to the school's progress, tutors, reports of progress, travel authorizations, sports and recreational camps, college applications, U.S. and Spanish passport renewals, as well as sign all paperwork related to the issuance of Argentinean citizenship and passports of the children."

The court find by clear and convincing evidence that the plaintiff had notice of the September 2010 dissolution judgment and paragraph 6 of the June 2016 stipulation, and that the provisions of the September 2010 dissolution judgment and paragraph 6 of the June 2016 stipulation are clear and unambiguous. The defendant has failed to meet his burden, however, of establishing by clear and

convincing evidence that the plaintiff wilfully violated the September 2010 dissolution judgment and paragraph 6 of the June 2016 stipulation. It is clear that the parties face challenges in communicating with each other. The plaintiff, in particular, was intemperate and disrespectful in some of her emails to the defendant that were admitted into evidence. Their differences of opinion in parenting matters – particularly with issues relating to the college education of their oldest daughter, who has reached the age of majority, and the private school education, prospective higher education and athletic activities of their son– do not rise to the level of a wilful violation of an order of the court.

The court turns next to the defendant's claim that the plaintiff violated the September 2010 dissolution judgment when she commenced an action in Spain to obtain a Spanish divorce rather than simply seeking to enforce the September 2010 dissolution judgment in Spain. While the defendant is appropriately outraged at the plaintiff's failure to provide adequate notice to him of the proceedings in Spain, her failure to do so does not implicate an order of this court. Therefore, there is no basis for holding the plaintiff in contempt.

## II

The defendant also seeks order from this court prohibiting the minor children from traveling to Spain, ordering the plaintiff to surrender their passports, and granting the defendant sole physical custody, together with an order opening the June 2016 stipulation to reduce the amount that he agreed to pay the plaintiff from his distribution of the net equity upon the sale of the former marital residence.

A-10

There is no basis in the record to support the additional relief that the defendant seeks.

In addition, the defendant has included a "grievance" against Kevin Collins, Esq., counsel for the plaintiff, in his post-hearing briefs. The court finds no merit in the defendant's contention that the court should enter sanctions against Attorney Collins. This is not the proper forum for addressing any claims that the defendant may seek to pursue against Attorney Collins.

Therefore, to the extent the defendant's motion for contempt, post-judgment is deemed to include claims for modification of custody, to open the June 2016 stipulation, or to enter sanctions against counsel for the plaintiff, the motion is denied.

### III

The plaintiff has called the court's attention to her motion for order, post-judgment (#214.00), filed on April 5, 2017, in which she seeks an order directing that all future motions filed by the defendant be subject to a "leave to file" protocol before being allowed to proceed on the merits. The court acknowledges the concerns raised by the plaintiff but declines to address them without affording the defendant an opportunity to respond.

Accordingly, the court on its own motion directs the parties to appear on a date certain so that the court may consider whether to impose sanctions pursuant to Practice Book § 1-25 for the defendant's conduct in this matter, including filing memoranda that exceed the page limits set forth in the Practice Book without leave of court. The hearing shall be

A-11

scheduled by Family Caseflow.

IV

For the reasons set forth above, the defendant's motion for contempt, post-judgment (#231.00) is hereby DENIED.

BY THE COURT,

/s/  Donna Heller
HELLER, J.

DOCKET No: FST-FA-09-4017497S    ORDER 433233

OLIVA SAINZ DE AJA, M

V.

IRAZU, FERNANDO GABRI

SUPERIOR COURT
JUDICIAL DISTRICT
OF STAMFORD AT
STAMFORD
5/14/2018

## ORDER

ORDER REGARDING:
12/31/2017    254.00    APPLICATION    FOR
EMERGENCY EX PARTE ORDER OF CUSTODY

The foregoing, having been heard by the Court, is
hereby:
ORDER: DENIED

A hearing was held on January 16, 2018 after ex
parte relief was denied on December 13, 2017. The
relief sought in the ex parte application –relating to
the defendant's 2017 holiday parenting time with the
partie's minor children– was moot by the time of the
hearing. Therefore, the application is hereby
DENIED.

Judicial Notice (JDNO) was sent regarding this order.

433233
/s/ Judge DONNA HELLER NELSON
Processed by: Megan Mccaffrey

| | |
|---|---|
| DOCKET No: FST-FA-09-4017497S | ORDER 433233 |
| | SUPERIOR COURT |
| OLIVA SAINZ DE AJA, M | JUDICIAL DISTRICT |
| V. | OF STAMFORD AT |
| | STAMFORD |
| IRAZU, FERNANDO GABRI | 5/14/2018 |

## **ORDER**

ORDER REGARDING:
12/12/2017  253.00 MOTION FOR CONTEMPT

The foregoing, having been heard by the Court, is hereby:
ORDER:  DENIED

The marriage of the plaintiff Margarita Oliva Sainz de Aja and the defendant Fernando Gabriel Irazu was dissolved on September 2, 2010 (the September 2010 dissolution judgment) (Harrigan, J.) (#149.55; #150.00).  On June 10, 2016, the plaintiff and the defendant entered into a stipulation (the June 2016 stipulation) (#210.00) that modified certain terms of the September 2010 dissolution judgment.  The stipulation was approved and so ordered by the court (Tindill, J.) that day.

The parties are the parents of three children, two of whom have not reached the age of majority.  On December 13, 2017, the defendant filed an application for an emergency ex parte order of custody (#254.00) and a motion for contempt, post-judgment (#253).  The court (Heller, J.) denied ex parte relief, and the application was schedule for a hearing on January 2,

2018, The hearing was continued to January 16, 2018 at the request of the plaintiff.

The parties were before the court on January 16, 2018 for the hearing on the defendant's application for an emergency ex parte order of custody and the motion for contempt, post-judgment. The plaintiff was represented by counsel, and the defendant represented himself. The court heard testimony from the parties, reviewed the exhibits that were admitted into evidence, took judicial notice of the court file, and reserved decision at that time.

As the application for an emergency ex parte custody order was focused on the defendant's access to the children over their 2017 winter holiday school vacation week, the application was moot by the time of the hearing in January 2018. Therefore, the hearing primarily addressed the defendant's motion for contempt, post-judgment.

The defendant testified that he had not spent one week of uninterrupted vacation time with the parties' children in eight years. He said that a friend's house in Norfolk, Connecticut had been available for his use during the holiday week. He wanted to take the minor children there so that they could spend a few days together. The plaintiff testified that the children, who are seventeen years old and almost fifteen years old, respectively, did not want to stay at an unfamiliar house. They wanted to see the defendant and go into New York City instead. According to the defendant, however, the children wanted to remain at home over the holidays because the plaintiff had invited their friends from other

countries and other parts of the United States to visit, thus effectively saboaging his parenting time.

After considering all of the testimony and documentary evidence admitted and the contents of the court file judicially noticed, an having the opportunity to observe the witnesses, the court finds by clear and convincing evidence that the plaintiff had notice of the September 2010 dissolution judgment and the June 2016 stipulation, and that the provisions of the Septmeber 2010 dissolution judgment and the June 2016 stipulation are clear and unambigous. The defendant has failed to meet his burden, however, of establishing by clear and convincing evidence that the plaintiff wilfully violated the September 2010 dissolution judgment and the June 2016 stipulation when she invited friends of the minor children to visit with them over the holidays; there was no evidence that the plaintiff intentionally acted to thwart the defendant's holiday parenting time. Therefore, the defendant's motion for contempt, post-judgment is hereby denied.

Although the court finds that the plaintiff's conduct does not rise to the level of a wilful violation of an order of the court, the court is also of the view that the plaintiff could do more to facilitate the defendant's parenting time with the children; simply leaving it to the defendant to "sort it out with the kids" is not enough. In addition, the parties and the minor children would benefit from a more deliberate approach to co-parenting going forward. To that end, the court refers the parties to Family Services for case management focused on co-parenting.

A-16

The parties are directed to contact Family Caseflow on or before June 1, 2018 to schedule a status conference with the court. Following the status conference, they will report to Family Services for a case managment intake.

<u>433233</u>
/s/ Judge: DONNA NELSON HELLER

**JDNO NOTICE**

FST-FA-09-4017497S

OLIVA SAINZ DE AJA, M v. IRAZU, FERNANDO
                                    GABRI

Notice Issued: 04/25/2018

Court Address:
CLERK, SUPERIOR COURT
JUDICIAL DISTRICT OF STAMFORD-NORWALK
123 HOYT STREET
STAMFORD, CT 06905
Website: www.jud.ct.gov

Notice Content:
Notice Issued: 04/25/2018
Docket Number:  FST-FA-09-4017497-S
Case Caption:  OLIVA SAINZ de AJA, M v. IRAZU,
FERNANDO GABRI
Notice Sequence: # 1

JDNO NOTICE

03/12/2018 262.00 **MOTION TO DISQUALIFY**
No Counsel Present. No Parties Present.
The foregoing having been considered by the Court, is
hereby:
ORDER: DENIED.

The court has studied the motion and memorandum
and exhibits filed in support thereof.  The court also
lisened to the defendant's argument and the
responsive argument of plaintiff's counsel.   The
defendant has failed to offer any evidence of bias on
the part of Judge Heller.   The substance of his

argument is targeted to explaining why Judge Heller's most recent ruling against him is incorrect. He argues in effect that it is so incorrect that the ony logical conclusion is that it must be the product of judicial bias. "It is an elementary rule of law that the fact that a trial court rules adversely to a lititgant, even if some of these rulings were to be determined on appeal to be erroneous, does not demonstrate personal bias. Obviously, if a ruling against a party could be used as … indicia of bias, at least half time, every court would be guilty of being biased against one of the two parties … The fact that [a party] strongly disagrees with the substance of the court's rulings does not make those rulings evidence of bias." *Emerick v. Emerick*, 170 Conn. Appl 368, 376-377 (Internal citations and quotations omitted). The defendant has taken an appeal to the Appellate Court challenging the merits of Judge Heller's decision. That is the proper venue for him to seek relief, not by challenging the integrity of a judge who was duty bound to weigh the evidence and render a decision. Nor is there any evidence of any other bias. Nor does the court find any basis for transferring the case to federal court. Family cases involving issues of child support, educational support and visitation and/or custody are traditionally and routinely tried and decided in state court regardless of the nationality of the parties. The defendant has provided no basis for treating this case differently.

<u>/s/ GENUARIO, J</u>.

A-19

**4/24/2018**

## STATE OF CONNECTICUT
## SUPERIOR COURT

## ORDER OF PROTECTION
JD-CL 099 Rev. 10-16
C.G.S. §§ 29-28, 29-32, 29-33, 29-36i, 29-36k, 46b-15,
46b-16a, 46b-38c(d)(e), 46b-38nn, 53a-28(f), 53a-36,
53a-42, 53a-217, 53a-217c, 53a-223, 54-1k, 54-86e, 18
U.S.C. §§ 922(g)(9), 2265 P.A. 16-34

Restraining Order – After Hearing [Order Type]
Family [Case Type]
Stamford J.D. [Superior Court location]
FST-FA18-4031046-S [Case number]

## Protected Person

OLIVA SAINZ de AJA, Margarita [Last name/First
name]
7/30/1969 [Date of birth]
F [Sex]
White [Race]
10 Indian Pass, Greenwich, CT, 06830 [Home
address]
10 Indian Pass, Greenwich, CT, 06830 [Mailing
address]
452 Fifth Avenue, New York, NY, 10018 [Work
address]

## Respondent *(Defendant)*

IRAZU, Fernando G. [Last name/First name/Middle]

## Respondent Identifiers

7/8/1968 [Date of birth]
M [Sex]
White [Race]
6.02 [Height]
2035708318 [Phone]
Bearded, dirty blond [Distinguishing features/other identifiers]
X    Intimate cohabitant [Relationship to protected person
   *(Present or former)*]
222 East 75th Street 6C, New York, NY 10021 [Address]

## Terms and Conditions of Protection

You, the Repondent, must follow all the orders and conditions checked or indicated by "X" below:

X    Surrender or transfer all firearms and ammunition.
X    Do not assault, threaten, abuse, harass, follow, interfere with , or stalk the protected person. (CT01)
X    Stay away from the home of the protected person and wherever the protected person shall reside. (CT03)

Additional terms and conditions are on the following pages:

General Restraining Order Notifications (Family) – JD-CL-104.; Additional Orders of Protection, JD-CL-100.

A-21

9/12/2019 [Expiration date *(if applicable)*]

X       The court had jurisdiction over the parties and the subject matter, and the respondent was provided with reasonable notice and opportunity to be heard. This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any US Territory, and may be enforced by Tribal lands (18 U.S.C §. 2265). Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment (18 U.S.C § 2262).
X       State law provides penalties for unlawful possession of firearms, ammunition, or electronic defense weapon (Connecticut General Statutes § 53a-217(a)(4) and 53a-217c(a)(5)). Federal law also providespenalties for possessing, transporting, shipping, or receiving any firearm or ammunition while subject to a qualifying protection order and under the circumstances specified in 18 U.S.C § 922(g)(8).

By the Court TRUGLIA [Name of Judge]

/s/ Kelly Obrien, AC [Signed *(Judge/Assistant Clerk)*]
9/12/2018 [Date signed]

A-22

**STATE OF CONNECTICUT
SUPERIOR COURT**

**ADDITIONAL ORDERS OF PROTECTION**
JD-CL 100 Rev. 10-14
C.G.S. §§ 29-28, 29-32, 29-33, 29-36i, 29-36k, 46b-38c(d)(e), 46b-38nn, 53a-36, 53a-42, 53a-217, 53a-217c, 53a-223, 54-1k, 18 U.S.C. §§ 922(g)(9), 2265
P.A. 14-217 §§ 186-190

Restraining Order – After Hearing [Order Type]
Family [Case Type]
Stamford J.D. [Superior Court location]
FST-FA18-4031046-S [Case number]

**Protected Person**

OLIVA SAINZ de AJA, Margarita [Last name/First name]

**Respondent** *(Defendant)*

IRAZU, Fernando G. [Last name/First name/Middle]

**Respondent Identifiers**

7/8/1968 [Date of birth] M [Sex] White [Race]

You, the Respondent, must follow all the orders and conditions checked or indicated by "X" below:

X Stay 100 yards away from the protected person. (CT16)
X Other: There is an exception for the 100 yard stay away when both children are present.

A-23

## APPENDIX D

### STATE OF CONNECTICUT

| | | |
|---|---|---|
| D.N. FST-FA-09-4017497S | : | SUPERIOR COURT |
| MARGARITA OLIVA SAINZ DE AJA | : | J.D. OF STAMFORD /NORWALK |
| v. | : | AT STAMFORD |
| FERNANDO GABRIEL IRAZU | : | JUNE <u>10</u>, 2016 |

### STIPULATION

The Parties in the above-captioned action hereby agree and stipulate as follows:

1. That the marriage of the parties was dissolved by entry of a decree of Dissolution on September 2, 2010 at which time the Court (J. Harrigan) issued a Memorandum of Decision (the "Memorandum") setting forth orders relative to child custody, child support, alimony and equitable distribution of the marital estate, among others.

2. In full satisfaction of Plaintiff's Motion for Contempt #204 and/or any financial claims of any nature whatsoever, the parties agree that the Defendant shall no longer be responsible to pay Plaintiff any future or past due contributions for or on behalf of the minor children for child support, childcare expenses, medical expenses, children's activities, real property taxes, legal fees, private school tuition, summer camps and/or automobile

related expenses for the minor children, among others.

3.    Plaintiff is hereby satisfied with the alimony granted per the Memorandum and renounces entirely to seek any modification on the subject.

4.    In consideration of the provisions of Paragraph 2 as set forth hereinbefore, the Defendant hereby agrees that he will pay to Plaintiff FOUR HUNDRED THOUSAND ($400,000.00) DOLLARS from his distribution of net equity upon the sale of the former marital residence located at 10 Indian Pass, Greenwich, Connecticut (the "Property"), all pursuant to the Memorandum.

5.    Subject to the proviso per 10 below, Plaintiff hereby acknowledges that Defendant by virtue of the terms set forth hereinbefore, shall be deemed to have satisfied in full all financial obligations set forth in this Stipulation and the Memorandum, and Defendant shall have no further obligation to pay any sums to Plaintiff.

6.    As of the date hereof, the Defendant represents that he relies upon Plaintiff's representation regarding the tenets of co-parenting and that both parties will fully abide by said standards going forward, in particular each party shall provide with prior written travel notifications of the children and prior conferring on selection of tutors, sports, and recreational camps, as well as college application process and in situ visits. Neither party shall require the consent of the other to travel with the children. Within the context of those duties, the Plaintiff will

allow the Defendant access to any and all information related to school's progress, tutor, reports of progress, travel authorizations, sports camps, college applications, U.S. and Spanish passport renewals, as well as sign all paperwork related to the issuance of Argentinean citizenship and passports of the children.

7.    All of the obligations by the Plaintiff in terms of necessary repairs, maintenance and payments of mortgage and real property taxes of the Property shall be incompliance with the terms of the Memorandum.

8.    The Plaintiff is hereby obliged to pay for and maintain in effect the insurance policy on the life of the Defendant for the exclusive equal benefit of the party's three (3) children until the youngest child attains the age of twenty-three (23) years.

9.    The Child Support Obligations Trust established before the Court by the Defendant on May 7, 2014, is hereby without effect, and any and all of its terms are superseded by this stipulation.

10.    The parties agree that if the Defendant were to have income as well as financial and patrimonial means comparable to the Plaintiff, the Defendant will assume his equal share of post-secondary educational expenses of their children paid by the Plaintiff. Subject to the prior, if the Defendant were not to pay for those expenses, the Court shall retain jurisdiction over said issue pursuant to C.G.S. §46b-56(c) for all of the three (3) children of the marriage.

11.    The Plaintiff shall within five (5) days hereof pay to the Defendant $20,000 in full satisfaction of

any and all claims that he may have or claim to have against the Defendant.

12.    The judgment lien recorded by Attorney Cavallo on the Greenwich land records in the approximate amount of $25,000 shall be the sole responsibility of the Defendant, to be paid from the distribution of the net equity realized from the sale of the Property per the Memorandum.

Executed in the City of Stamford, Connecticut on June <u>10</u>, 2016.

<u>/s/ Margarita Oliva Sainz de Aja</u>
Margarita Oliva Sainz de Aja, Plaintiff

<u>/s/ Fernando Gabriel Irazu</u>
Fernando Gabriel Irazu, Defendant, Pro Se


<u>/s/ Kevin F. Collins</u>
Kevin F. Collins, Esq.-Counsel for the Plaintiff

## **ORDER**

The foregoing stipulation, having found to be fair and equitable is SO ORDERED.

<u>/s/ Erika Tindill</u> 6/10/2016
JUDGE OF SUPERIOR COURT OF CONNECTICUT

A-27

## APPENDIX E

Docket No. FST-FA-09-4017497S

| | |
|---|---|
| MARGARITA OLIVA SAINZ DE AJA,<br>      Plaintiff, | Superior Court of the State<br>of Connecticut |
| v. | Judicial Disctrict of  Stamford<br>/ Norwalk at Stamford |
| FERNANDO GABRIEL IRAZU,<br>      Defendant. | November 22, 2010 |

## <u>ORDER RE MOT. 153[1]</u>

1.  There shall be a security deposit of $27,000 paid from the Defendant's assets to cover an arrears found to be owed by the Defendant to the Plaintiff in the sum of $1,204.50 and property taxes, life insurance on the Defendant's life and school tuition as ordered in the Memorandum of Decision of Judge Harrigan dated September 2, 2010, for the next twelve months.

2.  Execution may enter against any assets of the Defendant sufficient to pay said $27,000.

3.  Said $27,000 shall be deposited in escrow with attorney Kevin Collins as escrow agent and the escrow agent shall release funds to the Plaintiff, Margarita Oliva, when sums are due to be paid by the Defendant pursuant to the Memorandum of Decision of Judge Harrigan.

---

[1] *Petitioner's Clarification*: Exhibit O, *Hearings before Judge Heller,* 7/11-13/2017.

4. Specifically, the arrears shall be released by the escrow agent immediately, the school tuition and life insurance premium shall be released by the escrow agent monthly and the property taxes shall be released by the escrow agent in January and July, 2011.

5. Ownership of the $1,000,000 Northwestern Mutual Life insurance policy no. 16351848 on the life of Margarita Oliva Sainz de Aja shall be immediately transferred from Fernando Gabriel Irazu to Margarita Oliva Sainz de Aja without the necessity of the present owner signing any transfer document.

BY THE COURT
/s/ Robert John Malone 11/23/2010
Judge Robert J. Malone

EDWARD T. MATHEWS
CONSTABLE, CITY OF STAMFORD
STATE OF CONNECTICUT
P.O. BOX 4483
STAMFORD, CONNECTICUT 06907
(203) 536-9737

**FINANCIAL INSTITUTION EXECUTION**

AMOUNT OF EXECUTION: $27,075.00

DATE OF SERVICE: FEBRUARY 7, 2011

DOCKET NUMBER: FST-FA-09-4017497S

CASE NAME:  OLIVA v. IRAZU

NAME OF ENTITY: HSBC SECURITIES (USA) INC.

ADDRESS OF ENTITY:   101 BROAD STREET, STAMFORD, CT 06901

THOMAS FLYNN, FINANCIAL ADVISOR, HSBC

DEFENDANT'S NAME: FERNANDO GABRIEL IRAZU

APPEARANCE ADDRESS: 55 HIGH POINT CIRCLE, APT. B, RYE BROOK, NY 10573

MAKE ALL CHECKS PAYABLE TO:
        KEVIN COLLINS,ESQ. TRUSTEE
        1150 SUMMER STREET
        STAMFORD, CT 06905

**APPENDIX F**

| | | |
|---|---|---|
| FST FA 09 4017497 S | : | SUPERIOR COURT |
| MARGARITA OLIVA | : | JUDICIAL DISTRICT |
| SAINZ DE AJA | : | OF STAMFORD/ |
| V. | : | NORWALK |
| FERNANDO GABRIEL | : | AT STAMFORD |
| IRAZU | : | SEPTEMBER 2, 2010 |

## <u>MEMORANDUM OF DECISION</u>

The plaintiff wife, 40, and the defendant husband, 41, married in New York City on October 18, 1995.[121] The residency requirement of Conn. Gen. Stat. § 46b-44(c) has been satisfied by the plaintiff who has been a resident of this state for at least twelve months next preceding the date of the filing of the complaint seeking a decree of legal separation and additional orders. The plaintiff subsequently amended her request to a decree of dissolution (137). The parties have three children issue of the marriage, xxxxxxx, 11, xxxxxx, 10, and xxxxxx, 7.

The plaintiff was born and educated in Spain, graduating from Granada school of Law in 1992 with a J.D. degree. She became an instructor at the school for the ensuing two years while she pursued a Ph.D. She enrolled in Harvard Law School, class of 1995, for an LL.M degree. She then began a career in international law in New York. After Victoria was born in late 1998 she returned to work. A live in nanny was employed for five years.

---

[121] *Petitioner's Clarification*: The parties married in New York City on 10/6/1995.

The defendant is an international banker. He is from Argentina where he was educated. He and the plaintiff first met in 1994. On their joint IRS form 1040 for 2008 (Pl.Ex. #5) he reported total wages of $717,979 received from HSBC Securities. She reported receiving $141,576 wages from Allen & Overy LLP and $63,717 additional wages from her law firm. For 2007 (Pl.Ex. #7) the plaintiff's W2 issued to her by Allen & Overy LLP listed wages as $347,743 and the defendant's W-2 issued by HSBC listed his wages as $84,732. The defendant is currently unemployed. Despite the earning capacity he demonstrated in the recent past it was not shown that he is avoiding available employment in the international banking industry. The court cannot apply earning capacity without a demonstration that there is work available to him.

The parties purchased a home in Greenwich, Connecticut known as 10 Indian Pass in 1997 for $700,000 with a mortgage of $139,000. An appraisal valued the parcel at $1,180,000 as of February 5, 2010 (Pl.Ex. #2). The plaintiff continues to reside there with the children. The defendant moved out for the final time at the end of September 2009, to an apartment in Old Greenwich.

The causes of the breakdown of the marriage appear to the court to be the parties' inability to cooperate concerning decisions regarding their goals, their children's welfare and the fulfillment of their respective careers. The court finds that each party must bear some responsibility for the irretrievable breakdown.

A-32

A proposed parental responsibility plan was submitted to the court by the plaintiff dated May 28, 2010(138). The plaintiff affirms that it is their intention to mutually and flexibly cooperate and co-parent the children keeping the children's best interests as their primary concern. The court finds that the proposal meets the considerations described in Conn. Gen.Stat. § 46b-56(c) in making the orders for custody and has concluded the proposal satisfies the provisions of Conn. Gen.Stat. § 46b-56. The court has reviewed the proposed orders submitted by the defendant (145) and (148) concerning custody but finds the plaintiff's proposal more appropriate.

Having reviewed the evidence in light of the relevant statutes and case law the court renders judgment dissolving the marriage on the ground of irretrievable breakdown. The following orders are included as part of the decree.

1. No alimony is awarded to the husband. The husband shall pay to the wife the sum of one dollar per year alimony until the first to occur of a modification pursuant to Section 46b-86, the death or remarriage of the wife or June 1, 2020.

The parties shall have joint legal custody of the minor children. The primary residence of the children will be with the wife. The court finds that it is their intention to mutually and flexibly cooperate and co-parent the children, keeping the children's best interests as their primary concern.

2. The husband shall immediately apply for unemployment compensation and, effective upon his

receipt of the first payment to him of unemployment compensation, he shall pay to the wife child support for the three minor children as provided by the guidelines. On the first of each month, he shall provide to the wife a detailed report of his efforts to obtain employment, including any offer from a potential employer or headhunter.

In the event that the husband obtains employment, he shall notify the wife within ten days of his employment. Child support shall be modified on the husband's employment as provided by law.

In the event that the husband obtains employment, he shall pay a pro-rata share of the wife's child care expense and the cost of the children's activities based upon his income.

The parenting time for the husband with the children shall be as follows:

a. Wednesday nights overnight until Thursday morning;
b. Alternate weekends from Friday evening to Monday morning.
c. Monday night for dinner in the weeks when the children have been with the wife for the preceding weekend.

3. a. The Real Property at 10 Indian Pass, Greenwich, Connecticut is joint owned. The wife shall continue to have exclusive possession of the marital residence. The wife shall pay all monthly expenses of the residence including maintenance and repairs except that the parties shall each pay one-half of the

property taxes pertaining to the residence. On or before April 1, 2021, the year in which the youngest child reaches 18, the parties shall list the property for sale with a real estate broker at the then fair market value of the property. The wife shall also have the right to list the property for sale at any time between the date of the Decree of Dissolution and April 1, 2021 and the husband shall cooperate. The husband may demand an immediate sale upon the wife's remarriage, or cohabitation without proof of change in finances as required by Conn. Gen.Stat. § 46a-56b. At the closing of title regarding the sale of the marital residence, the first mortgage, any broker's commissions and all normal closing costs shall be paid and the remaining proceeds shall be divided equally after a credit is paid to the wife for the difference between the balance on the first mortgage on the date of the Decree of Dissolution and the balance of the mortgage on the date of the closing regarding the sale of the residence. Any sums due to the wife pursuant to any orders of the court shall be paid to the wife at the closing from the husband's portion of the net closing proceeds.

b. The husband shall retain his one-quarter interest in an apartment in Buenos Aires, Argentina.

c. The wife shall retain her interest in a beach house in Spain, subject to her mother's life estate.

d. HSBC stock: all of the HSBC stock, including the shares which are still restricted, shall be divided equally between the parties. One-half of all of the shares which have been released to the husband in 2009 and 2010 shall be divided immediately by the

transfer of one-half of the shares from the husband to the wife. The husband shall transfer one-half of the shares which shall be released to him in 2011 to the wife immediately upon the release of those shares to him.

e. Joint HSBC savings account: The balance in this account shall be divided equally between the parties and the account shall then be closed.

f. The sole accounts of the wife at Citibank shall remain her sole property. The sole account of the husband at Citibank shall be his sole property. The joint accounts of the parties at Citibank shall be closed.

g. Morgan Stanley Smith Barney Account No. xxx413 and xxx448 shall be divided equally between the parties immediately.

h. Retirement accounts: The husband's American Funds rollover IRA account xxx294, the husband's Vanguard HSBC Retirement Plan No. xxx317, the husband's Citigroup 401(k) and the wife's Allen Overy 401(k) account shall be divided equally by the transfer from the husband to the wife from the husband's American Funds IRA to an IRA in the name of the wife in the sum of $34,427.88, adjusted for any change in the total value of the retirement accounts due to market fluctuations from May 17, 2010, to the date of transfer.

The parties each shall have vacation time with the children as follows:

Each of the parties shall have one-half of the Christmas, February, March and April school breaks with the children.

Each of the parties shall have two weeks with the children during summer vacation.

These vacation periods shall supersede the regular parenting schedule and the regular parenting schedule shall resume at the end of each vacation period.

4. The wife shall continue to provide medical insurance for the minor children as available through her place of employment. Each of the parties shall pay one-half of all of the unreimbursed medical and dental expenses of the minor children.

The wife shall have parenting time with the children at all times when they are not with the husband.

5. a. The wife shall continue to be the owner of Northwestern Mutual Term Life insurance policy on the life of the husband in the face amount of $1,000,000 for the benefit of the three children of the marriage until the youngest child reaches the age of twenty-three. The husband shall be solely responsible for all premiums due on said life insurance policy. In the event that the husband fails to make a timely payment of a premium therefor, the wife shall have the right to pay the premium and to be immediately reimbursed by the husband therefor.

b. The wife shall continue to be the owner of a Northwestern Mutual term life insurance policy on

her life in the face amount of $1,000,000 for the benefit of the minor children until the youngest child reaches age twenty-three. The wife shall be solely responsible for all premiums due on said life insurance policy. In the event that the wife fails to make a timely payment of a premium therefor, the husband shall have the right to pay the premium and to be immediately reimbursed by the wife therefor.

c. The terms of paragraph 5 shall be subject to modification by the court.

The husband and the wife shall discuss and confer with reference to matters of policy involving the children as to such topics as health, education, recreational activities, camps and colleges, and the parties will attempt to adopt a harmonious policy best suited for the best interests of the children.

6. The court shall retain jurisdiction in accordance with Section 46b-56c of the Connecticut General Statutes to enter orders for the educational support to the three children. The parties shall promptly execute all documents necessary to apply for a scholarship for the tuition of the parties' son xxxxx at the Brunswick School and each of the parties will pay one-half of the tuition for Brunswick School for the school year 2010 to 2011 in excess of the scholarship. For the year 2011 and going forward, the parties will each pay one-half of the cost of any private school for any of the three children if they have agreed that the child will attend that private school.

If either party has knowledge of any illness or accident or other circumstances seriously affecting

A-38

the health or welfare of said child, the husband or the wife, as the case may be, will promptly notify the other.

7. Each of the parties agrees to keep the other party currently advised of the other's residence and business addresses, telephone numbers and whereabouts of the children while said child is with the husband or the wife.

8. Either parent may apply for an Argentinean passport or Spanish passport for any of the children and the parties shall cooperate.

9. The husband shall indemnify and hold harmless the wife against all claims and all liability arising out of any business activity in which he has been involved during the marriage of the parties, including but not limited to Knightsbridge Partners LLC, KP Foods, LLC, KP Capital, LLC, The Knightsbridge Universal Group, Inc., Knightsbridge Development Investments, Inc., Kent partners, Inc. and KP Ventures Ltd. He shall immediately remove the wife from any and all capacities with respect to all such entities, including officer, director, member or any other capacity and henceforth he shall not name her in any capacity.

10. Except as provided in the orders pertaining to the residence, each of the parties shall be solely responsible for their own liabilities.

BY THE COURT
/s/Harrigan, J.T.R.
HARRIGAN, J.T.R.